Reversed and Rendered, in Part, and Reversed and Remanded, in Part, and
Opinion filed September 30, 2004









Reversed and Rendered, in Part, and Reversed and
Remanded, in Part, and Opinion filed September 30, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00581-CV

____________

 

GREENBERG TRAURIG OF NEW
YORK, P.C., Appellant

 

V.

 

ROBERT MOODY, JR., HARRY
J. BRISCOE, ROBERT H. WILLIAMS, AND BRUCE PAYETTE, Appellees

_______________________________________________________

 

On Appeal from the 405th District Court

Galveston County, Texas

Trial Court Cause No. 99CV0471

_______________________________________________________

 

O P I N I O N








This is a double appeal of a
complex securities fraud and conspiracy case in which a jury rendered a
multi-million-dollar verdict in favor of three Texas investors and against a
New York law firm.  A fourth investor
recovered nothing.  The trial court
reduced the amounts of the jury awards for the successful plaintiffs and
entered final judgment against the law firm. 
All parties appeal.  At issue are
statutory claims alleging violations of state securities laws, conspiracy,
common-law fraud, and statutory fraud. 
The resolution of many of these issues turns on the conflicts-of-law
analysis.  We find the trial court should
have applied New York law instead of Texas law to the fraud-based claims.  After reviewing the issues raised under
applicable law, we reverse and render, in part, and reverse and remand, in
part.

I. 
Overview of Parties and Claims

A.  Parties

 

Appellees and cross-appellants
Robert Moody, Jr., Harry J. Briscoe, Robert H. Williams, and Bruce Payette, the
plaintiffs in the trial court (collectively, the AInvestors@), are
Texans who invested in a food technology venture known as Integrated Food
Technologies Corporation (AIFT@).  The Investors based their claims in this case
on their investments in this failed enterprise.

Appellant Greenberg Traurig of
New York, P.C. (AGreenberg
Traurig@), one of
several defendants in the trial court, is a national law firm, based in New
York.  IFT retained Greenberg Traurig to
perform various legal services on its behalf. 
The Greenberg Traurig attorneys who were principally involved in this
legal representation, Robert Kirshenberg and Stephen Weiss, were originally
named as defendants.  These individual
attorneys successfully challenged the trial court=s
jurisdiction over them and the claims against them were dismissed due to lack
of personal jurisdiction. 

B.  Facts

IFT is a Delaware corporation
formed to Adesign, develop, and market
biotech indoor aquaculture production and processing facilities,@ which
essentially entailed raising fish in technologically-advanced tank
facilities.  IFT had two facilities in
operation, one located in Pennsylvania and one in Maine.  The Pennsylvania facility served as IFT=s
headquarters.








IFT=s
founder, Jack Summers (AJ.
Summers@), professed
to be an international marketing strategist with a history of marketing food
technology systems and products.  
J. Summers was IFT=s
Chairman and Chief Executive Officer (ACEO@).  His son, Robert Summers (AR.
Summers@) was
Director of Operations for IFT.

Greenberg
Traurig=s
Representation of IFT

In 1995, Robert Kirshenberg was a
litigation associate in Greenberg Traurig=s New
York office.  Kirshenberg, who owned a
very small amount of stock in IFT, approached J. Summers about the possibility
of Greenberg Traurig representing IFT. 
Although no attorney-client relationship resulted at that time, the
following year IFT retained Greenberg Traurig as its corporate counsel.  In November 1996, Greenberg Traurig agreed to
represent IFT Ain connection with both the
Company=s general
corporate affairs and a proposed initial public offering, together with other
attendant corporate and [Securities and Exchange Commission] matters.@  

A public offering requires
securities to be registered with a governmental agency.  Both registered and unregistered securities
have disclosure requirements to potential investors; however, registered
securities also require audited financial statements.  The accounting firm of Arthur Andersen began
serving as IFT=s independent auditor in
mid-1996, but very shortly thereafter decided to discontinue the
relationship.  One of Greenberg Traurig=s first
duties once retained to represent IFT in the fall of 1996 was to try to
convince Arthur Andersen to reconsider its decision to withdraw as independent
auditor for IFT.  Arthur Andersen had
agreed in June 1996 to audit IFT=s
financial statements as of March 31, 1996. 
However, in October 1996, Arthur Andersen resigned as IFT=s
independent auditor, stating that J. Summers had failed to disclose a recent
judgment against him in Mississippi for conversion of corporate funds.  Despite Greenberg Traurig=s efforts
to convince the accounting firm to stay on board as IFT=s
independent auditor, Arthur Andersen would not reconsider its decision to
terminate its relationship with the company. 









IFT also asked the
recently-retained Greenberg Traurig to assist the company=s
management in preparing for an annual shareholders meeting to be held on
November 23, 1996.  Greenberg Traurig
helped edit the script of the presentation IFT=s
management would make at the shareholders meeting.  With regard to the Arthur Andersen matter,
Greenberg Traurig suggested that the IFT board tell the shareholders, AWe have
encountered some difficulty with the Andersen group and are exploring a number
of ways to proceed with them or another big 6 firm.@  No mention was made of the Mississippi
judgment or the reason Arthur Andersen terminated its relationship with IFT.

By the end of 1996, IFT had hired
a new independent auditorCthe accounting
firm of Parente, Randolph, Orlando, Carey & Associates (AParente
Randolph@)Cto
complete the audit originally begun by Arthur Andersen.  In January 1997, IFT also hired the law firm
of Gross, McGinley, LeBarre & Eaton (AGross
McGinley@),
apparently replacing Greenberg Traurig, as the company=s
corporate counsel.  Greenberg Traurig,
however, continued to represent IFT in a trademark litigation matter.

Compliance
with Securities Laws and Rescission Offer to IFT Investors

About that time, issues arose as
to whether IFT=s stock had been issued in
compliance with securities laws.  A
company like IFT could begin with the private placement of unregistered shares
of stock to an unlimited number of accredited investors and a limited number of
unaccredited investors, and later undertake an initial public offering to
register the shares and sell them publicly. 
In a letter to Parente Randolph, dated February 24, 1997, Gross
McGinley, IFT=s new corporate counsel, opined
that IFT stock Amay have
been issued without compliance with or exemption from securities registration
or disclosure acts.@  IFT asked Gross McGinley to take action to
bring the company into compliance with securities laws.  








In the spring of 1997, IFT=s
financial statements for the fiscal year ending March 31, 1996, were issued
disclosing IFT=s past noncompliance with
securities law, and stating the Aultimate
outcome in this matter cannot be determined at this time.@  Due to these securities compliance issues, it
appeared that IFT might need to present a rescission offer to existing
shareholders in order to bring IFT into compliance with the securities
laws.  This remedial action stemmed from
J. Summers= sales of IFT shares in violation
of a permanent injunction the Securities and Exchange Commission (ASEC@) had
issued against him in 1981,[1]
enjoining him from selling unregistered securities.[2]  These developments prompted IFT to again seek
legal advice, this time from Ellsworth, Wiles & Chaplain (AEllsworth
Wiles@), a
Philadelphia law firm retained in May 1997, to serve as IFT=s Asecurities
attorneys in connection with a rescission offer to some or all of IFT=s
stockholders.@ 


These developments were
significant because any sales in violation of the SEC permanent injunction
against J. Summers would not only raise serious compliance issues, but also
would jeopardize IFT=s plans
for an initial public offering.  Within a
few months, Ellsworth Wiles concluded that IFT would have to make a rescission
offer to current shareholders.  In a July
7, 1997 memorandum, attorney Gerald Chalphin of Ellsworth Wiles suggested that
IFT should set aside more than $16 million to cover the cost of the rescission
offer.  Greenberg Traurig denied any
knowledge of Ellsworth Wiles= estimate
for the rescission offer.  








The Texas Investors

In
mid-October 1997, the investment banking firm of Donaldson, Lufkin &
Jenrette (ADLJ@) was
engaged to underwrite an initial public offering for IFT.  In late October 1997, appellee Robert Moody,
Jr., an accredited investor, toured IFT=s facility
in Pennsylvania as a prospective investor in the company.  J. Summers urged Moody to purchase IFT stock,
telling him that DLJ was about to underwrite an initial public offering.  In mid-October 1997, J. Summers sent Moody
copies of draft IFT financial statements for 1997, stating, AWe do not
expect any major changes.@  A few days later, IFT=s new
auditors, Cogen Sklar, L.L.P., sent a draft auditor=s report
to R. Summers.  Note 16 of the report
indicated that IFT stock Amay have
been issued without compliance with or exemption from certain securities
registration or disclosure acts.@  Cogen Sklar further explained it was Aunable to
express, and we do not express, an opinion on the financial statements.@  Within a few more days, J. Summers sent Moody
selected pages from Cogen Sklar=s draft
auditor=s
report.  The bottom of each page sent to
Moody stated:  AThe
accompanying notes are an integral part of these financial statements.@  However, J. Summers excluded the page
containing the notes from the pages he gave Moody.  Thus, Moody did not receive the pages from
the report stating that the stock had not been issued in compliance with
securities regulations.  On October 29,
1997, after touring IFT=s
Pennsylvania facility and meeting with J. Summers, Moody purchased $600,000 in
IFT shares.[3]  Greenberg Traurig was not involved in, and
claimed to know nothing about, Moody=s
dealings with J. Summers.








In December 1997, appellee Harry
Briscoe, an accredited investor, purchased $30,000 worth of unregistered IFT
shares.  Although DLJ had terminated its
agreement with IFT, J. Summers represented to Briscoe that the securities firm
was going to underwrite IFT=s initial
public offering, which J. Summers represented was imminent.  J. Summers sent Briscoe a copy of the draft
prospectus.  Greenberg Traurig was not
involved in, and claimed to know nothing about, Briscoe=s
dealings with J. Summers, his investment in IFT, or the prospectus on which he
claimed to have relied.

In February 1998, appellee Robert
Williams, an accredited investor, purchased his IFT shares for $27,500.  Williams first heard of IFT when Briscoe
spoke to him about it in the fall of 1997. 
Briscoe provided Williams with a videotape and a copy of the draft
prospectus.  Briscoe told Williams that
J. Summers had represented to him that an initial public offering was
imminent.  Williams relied on the same
prospectus Briscoe had reviewed.

Preparation
for an Initial Public Offering

During 1997, Ellsworth Wiles
continued to serve as IFT=s Asecurities
attorneys.@[4]  In early November 1997, Kirshenberg wrote R.
Summers a letter, in which he reviewed the scope of Greenberg Traurig=s work
for IFT, and stated, among other things, that Greenberg Traurig Aremain[ed]
eager to assist you in finding an appropriate underwriter or other source of
capital.@  In December 1997, IFT asked Greenberg Traurig
to introduce IFT to investment bankers in furtherance of its goal of an initial
public offering.  

With the IFT stock rescission
offer still an issue, on December 9, 1997, Gerald Chalphin of Ellsworth Wiles
then opined that the rescission offer would cost IFT $110,000.  No mention was made of the previously
suggested $16 million figure necessary to cover the liability for the
rescission offer as set forth in Chalphin=s July 7,
1997 memorandum.








In January 1998, IFT issued its
annual report for the fiscal year ending March 31, 1997.  As in the report for the fiscal year ending
in March 1996, Cogen Sklar, IFT=s
independent auditor, explained that IFT=s stock
might not have been issued in compliance with certain securities
regulations.  However, the report further
explained, AThe Company estimates that the
potential cost associated with this matter will be less than $110,000, but does
not believe that this outcome is probable.@  Though Cogen Sklar explained in the annual
report that the problem could be resolved for $110,000, it did not mention the
previous $16 million estimate. 

Meanwhile, Greenberg Traurig was
seeking to expand the scope of its representation of IFT and had introduced the
accounting firm, Ernst & Young, to IFT as a potential independent
auditor.  During the course of conducting
its due diligence on IFT, Ernst & Young learned of the 1981 SEC injunction
against J. Summers.  In February 1998,
Ernst & Young informed Kirshenberg and Greenberg Traurig of the
injunction.  Given J. Summers= problems
with the SEC, Greenberg Traurig told J. Summers that in order for an initial
public offering to proceed, J. Summers should step down as CEO of IFT and place
his shares in a non-voting trust.  

J. Summers=
Resignation as CEO of IFT and Appointment to Executive Committee

In April 1998, a letter was sent
to shareholders informing them that J. Summers was stepping down as IFT=s CEO,
but that he would remain with IFT to continue efforts to market its technology
system, and that A[a] new
CEO and management organization [would] take over the day-to-day operations of
the company.@ 
However, the April 27, 1998 IFT board meeting minutes reflect that the
board authorized the creation of the AExecutive
Committee to run the daily operations of the company.@  The Executive Committee was to be chaired by
J. Summers.  Although J. Summers was
supposed to have put his IFT shares in a non-voting trust, that never happened.  Greenberg Traurig denied any knowledge of
J. Summers= secret
role in running IFT.

Maine Litigation








In May 1998, IFT, J. Summers, and R. Summers were sued in the
United States District Court in Maine for, among other claims, selling
unregistered securities in violation of Maine securities laws.  Kirshenberg settled the lawsuit on behalf of
IFT.  Kirshenberg testified that he
became aware of J. Summers= selling of IFT stock during the Maine lawsuit in late spring
or early summer 1998. 

Loans
from Bank of Pennsylvania

In the meantime, Greenberg
Traurig had continued its efforts to secure financing for IFT.  In August 1998, with the assistance of
Greenberg Traurig, IFT obtained a secured loan in the amount of $750,000 and a
secured line of credit in the amount of $500,000 from the Bank of Pennsylvania.  IFT defaulted on the loan just two months
later in October 1998, and the bank foreclosed on the collateral.  

IFT=s
Bankruptcy

Greenberg Traurig was pursuing
the possibility of an initial public offering for IFT until October 1998, when
Tyler Carlucci, who was then CEO of IFT, informed Dan Moran, another IFT
officer, that he had discovered a list of more than 1,000 IFT shareholdersCmore
shareholders than are legally permitted for a nonpublic company.  Carlucci concluded that IFT was not in compliance
with federal securities laws.  Carlucci
and Moran also discovered J. Summers had not paid value for his IFT
shares.  They met with IFT=s
directors to address these serious matters, but ultimately IFT could not be
salvaged.  Carlucci and Moran eventually
sought Chapter 11 bankruptcy protection for IFT in November 1998.  No initial public offering was ever
made.  

C.  The Investors= Claims

The Investors brought suit in a
state district court in Galveston, Texas, against J. Summers, R. Summers,
Pegasus Enterprises, Cogen Sklar, IFT, two of IFT=s
directors (Phil Templeman and Elaine Templeman), Greenberg Traurig, and two of
the law firm=s attorneys (Kirshenberg and
Weiss).  The claims against R. Summers,
Cogen Sklar, Weiss, and Kirshenberg were dismissed after the granting of their
special appearances.  J. Summers, the
Templemans, IFT, and Pegasus Enterprises failed to appear at trial.  








The Investors sought to recover against Greenberg Traurig for
alleged violations of the Texas Securities Act and also asserted claims based
on statutory fraud, common-law fraud, and civil conspiracy.  The Investors claim that Greenberg Traurig
assisted J. Summers in defrauding them by failing to disclose the law firm=s alleged
knowledge of the following:

$          In 1981, the SEC enjoined J. Summers from selling
unregistered securities.

$          A judgment had been taken against J. Summers in Mississippi
for conversion of corporate funds.

$          IFT and J. Summers had been sued in federal court in
Oklahoma Arelated to the acquisition@ of IFT stock and had paid
to settle that lawsuit.

$          IFT and J. Summers had been sued in federal court in Maine
for selling unregistered securities in violation of Maine law.

$          J. Summers had been granted a discharge in bankruptcy.

$          Predecessor companies also founded by J. SummersCAquaTech International,
Ltd. and Nutritech Systems, Ltd.Chad both failed.

$          No initial public offering could ever be made because J.
Summers had been selling unregistered securities in violation of the SEC
injunction.

$          IFT had too many shareholders for a
nonpublic corporation.  

II.  Jury Findings and Trial Court Judgment

The jury found Greenberg Traurig
liable for (1) violations of the Texas Securities ActCdirectly
as a seller, and indirectly as a control person and in materially aiding a
seller, (2) common-law fraud, (3) statutory fraud (including by clear and
convincing evidence of Greenberg Traurig=s actual
awareness of the fraud), and (4) civil conspiracy (including by clear and
convincing evidence that Greenberg Traurig acted with malice).  Breaking the statutory cap on exemplary
damages,[5]
the jury further found Greenberg Traurig had secured the execution of a
document by deception[6]
and had committed commercial bribery.[7]  








The trial court=s final
judgment awarded Moody actual damages of $690,090 and prejudgment interest of
$193,225.20 against Greenberg Traurig and all other defendants, jointly and
severally.  Moody was also awarded
exemplary damages of $20,702,700 against Greenberg Traurig.[8]  

Briscoe was awarded actual
damages of $30,000 and prejudgment interest of $8,400 against Greenberg Traurig
and all other defendants, jointly and severally.  Briscoe was also awarded exemplary damages of
$900,000 against Greenberg Traurig.[9]  

Williams was awarded actual
damages of $27,500 and prejudgment interest of $7,700 against Greenberg Traurig
and all other defendants, jointly and severally, and exemplary damages of
$825,000 against Greenberg Traurig.[10]

The final judgment further
ordered that Moody, Briscoe, and Williams recover from Greenberg Traurig
attorney=s fees of
$1,611,500 for preparation and trial, plus $325,260 for expenses, $190,000 for
appeal to the court of appeals, and $85,000 for appeal to the Texas Supreme
Court.  








Although the jury awarded Moody
$20,702,700, Briscoe $900,000, and Williams $825,000 in actual damages for
common-law fraud, the trial court did not award those amounts, but instead
reduced those amounts in its final judgment. 
The jury failed to find in favor of Bruce Payette on any of his claims
against Greenberg Traurig.[11]
We will address issues relating to those awards in our consideration of Bruce
Payette=s
cross-appeal.  

III.  Conflicts of Laws

Whether to apply Texas, Pennsylvania, or New York law to the
Investors= claims is a pivotal issue in this
case. The trial court applied Texas law to all claims.  Greenberg Traurig claims that the trial court
erred in applying Texas law because New York law should govern the fraud-based
claims.  The Investors argue there was no
error but that we need not even reach this issue because Greenberg Traurig
waived any complaint about the application of Texas law by failing to properly
preserve error for appellate review.  

A.  Preservation of Error

The Investors assert Greenberg
Traurig has waived its contention that New York law should apply to this case. After
reviewing the record, we disagree and find that Greenberg Traurig adequately
preserved this issue for appeal.  In the
trial court, Greenberg Traurig asserted the application of New York law in many
ways:

$          by arguing New York law applied in its
motion for summary judgment, which the trial court denied, specifically stating
that ATexas law applies in all aspects of this matter;@ 

$          by making conflicts-of-laws arguments
in its trial brief regarding applicable attorney disciplinary rules;








$          by making oral arguments to the trial
court during trial that New York disciplinary rules applied to New York
attorneys;

$          through charge conference objections
to the application of Texas law, which the trial court overruled;

$          by requesting the trial court to take
judicial notice of all conflicts-of-laws issues presented, which the trial
court did;

$          by arguing for the application of New
York law at the hearing on the motion to enter judgment (directly after
receiving the jury=s verdict), which arguments the trial court again
rejected; and

$          by
setting forth the conflicts-of-laws arguments in its consolidated post-trial
motion, which the trial court denied.

To preserve an issue for appellate review, a party must make
its complaint known to the trial court by a timely request or objection that is
specific enough for the trial court to be aware of the complaint and then
receive a ruling from the trial court.  Tex. R. App. P. 33.1.  We find Greenberg Traurig=s conflicts-of-laws arguments were properly
preserved for appellate review. 
Accordingly, we now turn to the merits of these arguments.

B.  Applicable
Law

A court must make a conflicts-of-laws decision only when the
case is connected with more than one state and the laws of the states in question
differ on one or more points in issue.  See
Weatherly v. Deloitte & Touche, 905 S.W.2d 642, 650 (Tex. App.CHouston [14th Dist.] 1995, writ dism=d w.o.j.), leave granted, mand.
denied, 951 S.W.2d 394 (Tex. 1997) (holding burden is on party asserting application
of foreign law to first show existence of true conflict of laws and then
demonstrate which law should apply; in absence of such showing, it is presumed
other states= laws are same as Texas law).  Because this is such a case, our task is to
determine which state=s lawCTexas, Pennsylvania, or New YorkCshould govern the Investors= claims.  








Standard of Review

The issue of which state=s law governs is a question of law
for the court to decide.  Torrington
Co. v. Stutzman, 46 S.W.3d 829, 848 (Tex. 2000).  Therefore, we review de novo the trial court=s decision to apply Texas law.  See Minnesota Mining & Mfg. Co. v.
Nishika Ltd., 955 S.W.2d 853, 856 (Tex. 1996). 

General Discussion

In Texas, when there is a conflict of laws, the method for
determining the applicable law is the Amost significant relationship@ test contained in the Restatement
(Second) of Conflicts of Laws.  Hughes
Wood Prods., Inc. v. Wagner, 18 S.W.3d 202, 205 (Tex. 2000).  Generally speaking, in determining
conflict-of-laws issues, Texas courts focus their examination on which state
has the most meaningful connections with and interests in the parties and the
transactions.  The various contacts are
to be evaluated according to their relative importance with respect to the
particular issue at hand.  Id.  This Restatement methodology requires a
separate conflict-of-laws analysis for each issue in a case.  

The claims in this case may be grouped into two categories:
(1) fraud-based claims and (2) conspiracy claims.  Although Greenberg Traurig challenges the
application of Texas law to the fraud-based claims, it asserts no differences
in the substantive law of New York and Texas applicable to the Investors= conspiracy claims.  Accordingly, with respect to the conspiracy
claims, we need not conduct a conflict-of-laws analysis; instead, we may
presume New York law is the same as Texas law. 
See Weatherly, 905 S.W.2d at 650. 
Thus, we apply Texas law to the conspiracy claims and conduct a
conflict-of-laws analysis for the fraud-based claims.  

Fraud-Based Claims








The starting point for any conflict-of-laws decision is the
Restatement (Second) of Conflicts of Laws Section 6.  See Restatement
(Second) of Conflicts of Laws ' 6 (1971).  The factors relevant to our application of
the Amost significant relationship@ test are drawn from Section 6(2),
which provides a list of the following general factors:

(a)       the needs of the interstate and international systems;

(b)       the relevant policies of the forum;

(c)       the relevant policies of
other interested states and the relative interests of those states in the
determination of the particular issue;

(d)       the protection of justified expectations,

(e)       the basic policies underlying the particular field of law;

(f)        the certainty, predictability, and uniformity of result, and 

(g)       the ease in
the determination and application of the law to be applied. 

Id. 
More particularized factors are found in other relevant sections of the
Restatement.  The contacts to be
considered in applying the Section 6 
principles to an issue in tort are found in Section 145.  See Restatement
(Second) of Conflicts of Laws ' 145. 
This section states:

(1)       The rights and
liabilities of the parties with respect to an issue in tort are determined by
the local law of the state which, with respect to that issue, has the most
significant relationship to the occurrence and the parties under the principles
stated in ' 6. 

(2)       Contacts to be taken into account . . .
to determine the law applicable to an issue include: 

 

(a)       the
place where the injury occurred, 

(b)       the
place where the conduct causing the injury occurred, 

(c)       the
domicile, residence, nationality, place of incorporation, and place of business
of the parties, and 

(d)       the place where the relationship, if any,
between the parties is centered. 

Id. 









A third provision of the Restatement, Section 148, applies to
actions to recover pecuniary damages for fraud or misrepresentation.  See Restatement
(Second) of Conflict of Laws ' 148. 
Although the Texas Supreme Court has not yet applied this section, this
court and other intermediate appellate courts have done so in determining the
governing law in fraud and misrepresentation cases.  See Tracker Marine, L.P. v. Ogle, 108
S.W.2d 349 (Tex. App.CHouston [14th Dist.] 2003, no pet.); Scottsdale Ins. Co.
v. National Emergency Servs., Inc., No. 01-02-00929-CV, 2004 WL 1688540, at
*7 (Tex. App.CHouston [1st Dist.] 2004, no pet.
h.).  The Restatement factors set forth
in Section 145 for general torts are very similar to those listed in Section
148 for fraud and misrepresentation. 
Scottsdale Ins. Co., 2004 WL 1688540, at *7.  The factors under Section 148 include:

(a)       the place where the plaintiff acted in reliance upon the
defendant=s representations; 

(b)       the place where the
plaintiff received the representations; 

(c)       the place where the defendant made the representations; 

(d)       the domicile, residence, nationality, place of incorporation
and place of business of the parties; 

(e)       the place where a tangible thing which is the subject of the
transaction between the parties was situated at the time; and 

(f)        the place
where the plaintiff is to render performance under a contract which he has been
induced to enter by the false representations of the defendant.  

Restatement (Second) of Conflicts of Laws ' 148(2).  

The comments to Section 148(2) of the Restatement describe
contacts (a), (b), (c), and (d) as the Amore important of these contacts.@ 
Id. at cmt. e.  AIf any two of the above-mentioned
contacts, apart from the defendant=s domicile, state of incorporation,
or place of business, are located wholly in a single state, this will usually
be the state of the applicable law with respect to most issues.@  Id. at cmt. j; see also Tracker
Marine, L.P., 108 S.W.3d at 356.  The
contacts in this case fall in three statesCTexas, Pennsylvania, and New
York.  








Contacts (a) and (b) point to Pennsylvania and Texas.[12]  Contact (c) points only to New York.  Contact (d) points to both Texas and New
York.  Contact (e) points to
Pennsylvania.[13]  Contact (f) has mixed results.[14]  However, most of the conduct upon which the
Investors= claims are based occurred in New
York.  This is significant because when
evaluating fraud-based claims to determine governing law, the principal focus
is where the conduct occurred.  See
Restatement (Second) of Conflict of Laws
'' 145, 148. 

In the trial court the Investors asserted a variety of
allegations against a number of different parties. Some of the allegations were
aimed at IFT and its principals, with whom the Investors had personal contact
and direct dealings, while other allegations were aimed at defendants like
Greenberg Traurig, with whom the Investors had no contact and no direct
dealings.  This important distinction
greatly impacts the conflict-of-laws analysis.








The Investors allege that Greenberg Traurig made affirmative
misrepresentations concerning IFT=s financial condition,[15]
J. Summers= Alegal woes,@[16] the Abona fides of IFT=s management,@[17] and IFT=s Aability to go public.@[18] 
The gist of these allegations is that Greenberg Traurig made it possible
for IFT to continue the illusion that an initial public offering would occur
and that Greenberg Traurig Amade unlawful selling possible@ by preparing documents and otherwise
helping to construct an illusory initial public offering that J. Summers used
as a Amajor selling tool.@ 
To the extent Greenberg Traurig made misrepresentations concerning these
matters, it made them from its offices in New York.  These representations were not directed to
Texas. Except for one visit to Pennsylvania, whatever Greenberg Traurig did, it
did in New York.








Though some events significant to the Investors= claims as they relate to the other
defendants occurred outside New York, these events did not occur in Texas but
in Pennsylvania.  The Investors allege that
in late October 1997, Moody toured IFT=s facility in Pennsylvania, where J.
Summers urged him to invest in IFT by 
telling him that DLJ was about to underwrite an initial public
offering.  J. Summers made similar representations
to Briscoe, who purchased IFT shares and then passed the IFT draft prospectus
along to Williams, who also invested. 
Funds (checks and wire transfers) for these purchases of IFT shares were
sent to Pennsylvania, although they originated in Texas.  The only other conduct relating to Texas is
that IFT and its principals traveled to Nacogdoches, Texas, for an IFT
presentation, but that trip was made long before IFT retained Greenberg
Traurig.  Because the Investors= claims against Greenberg Traurig
must be evaluated separately and without dependence on claims against the other
defendants, these Texas contacts have little, if any, impact on the
conflict-of-laws decision.  Even if they
did, it is clear that these contacts with Texas were neither more numerous nor
more qualitatively significant than either the New York or the Pennsylvania
contacts.

Pennsylvania=s contacts include the location of IFT=s headquarters and main operating
facility where Moody decided to invest. 
With respect to the claims against Greenberg Traurig, however, New York
has the dominant contacts with the parties and the particular events in
issue.  New York is the home state of
Greenberg Traurig.  Most of the conduct
in question occurred in New York and substantially all of Greenberg Traurig=s activities vis a vis IFT
occurred in New York.  None occurred in
Texas. 

The Texas contacts are relatively few, the principal one
being that it is the home state of the Investors.  Significantly, all of the events relating to
the Investors= claims against Greenberg Traurig occurred
outside of Texas. To the extent that harm occurred in Texas and the injured
parties resided in Texas, Texas may have an interest in assuring that these
individuals secure redress for any damages suffered.  The relative strength of this interest, however,
depends on the balance of policies struck by the relevant tort laws.  See Restatement
(Second) of Conflicts of Laws ' 145 cmt. c.








Generally, the state where the act or omission occurs has a
real interest in applying its law in order to implement the state=s regulatory policy as reflected in
that law.  Securities fraud is an area of
the law regulated by statute.  Because
New York=s securities statutes reflect its
regulatory policies, New York has a strong and substantial interest in the
application of its laws in furtherance of those policies.  Id. at ' 6(c).  Greenberg Traurig=s connections to New York are
significant and strongly support New York=s substantial interest in seeing its
law apply to the Investors= fraud claims.  By
choosing to apply Texas law instead of New York law, the trial court did not
recognize New York=s substantial interest in regulating fraudulent conduct
occurring in New York.  Cf. id. at
' 145 cmt. c (AIf the primary purpose of the tort
rule involved is to deter or punish misconduct, . . . the state where the
conduct took place may be the state of dominant interest . . .@). 


The Restatement counsels that in tort cases, the expectations
of the parties are less significant than in contract cases.  See id. at ' 145 cmt. b.  However, to the extent this consideration
factors into the analysis, it points to New York law.  The individuals investing in IFT had a
reasonable expectation that New York law would govern any transaction because
the draft prospectus on which the Investors rely to support their fraud
allegations states that New York law would govern.  Although the Investors point to Moody=s Stock Purchase Agreement, which
contains a Texas choice-of-law provision, their reliance on this contract is
misplaced because it governs only this agreement, to which Greenberg Traurig
was not a party.  Therefore, this
choice-of-law provision cannot be enforced against Greenberg Traurig.  See Restatement
(Second) Conflicts of Law ' 187 (setting forth factors when
parties have chosen law of state Ato govern their contractual rights
and duties@); In re J.D. Edwards World
Solutions Co., 87 S.W.3d 546, 549 (Tex. 2002) (involving Athe contracting parties= choice of law@) (emphasis added).








It is apparent from the Investors= pleadings that their claims against
Greenberg Traurig arose from conduct centered in, or directed to, New
York.  The professional services the law
firm provided were performed in New York. 
The law firm=s participation in meetings and activities with other actors
implicated in the fraud and conspiracy allegations (e.g., J. Summers and IFT)
also occurred in New York.  The written
communications from Greenberg Traurig alleged to be part of the fraud and
conspiracy emanated from the law firm=s offices in New York.  No conduct of Greenberg Traurig occurred in,
or was directed to, Texas.  Consequently,
the New York lawyers involved in these transactions would have had no
reasonable expectation that Texas law would govern their conduct.  Because the Investors were aware that they
were dealing with non-Texans and because Greenberg Traurig had no equivalent
awareness of the Texas Investors, considerations of fairness and
protection of the reasonable expectations of the parties point to the
application of New York law. 

Although the Investors are Texans, there is little other
connection with Texas.  Most of the
original defendants are residents of New York or Pennsylvania.  The meetings and communications between the
Investors and one or more alleged conspirators took place outside of Texas.  The accounting firms that served or were
requested to serve as independent auditors of IFT  (Arthur Anderson, Parente-Randolf, Cogen
Sklar, and Ernst & Young), as well as the investment banking group, and the
securities corporations (DLJ, Bear Stearns & Co., Inc., and Josephthal
& Co., Inc.), were based in New York or Pennsylvania.  IFT=s facilities were located in
Pennsylvania and Maine.  Given that the
conduct alleged to have caused the Investors= injuries occurred mostly in New York
and, to a lesser extent, in Pennsylvania, the Texas interests are attenuated
and far less significant given the relevant considerations.  It is New York, as the locus of most of the
alleged fraudulent acts and as Greenberg Traurig=s principal place of business, that
has the greatest interest in fashioning the penalty imposed by the tort system.  

Greenberg Traurig performed no attorney services for IFT in
Texas.  Its attorneys were not licensed
to practice law in Texas.  More
importantly, the locus of their allegedly tortious conduct was not in Texas.








The Investors= fraud claims against Greenberg Traurig are based largely on
the law firm=s alleged duty to disclose IFT=s fraudulent conductCa duty the Investors claim arose from
Greenberg Traurig=s attorney-client relationship with IFT.  These claims hinge almost entirely on the
notion that by failing to disclose alleged fraud by its client, IFT, Greenberg
Traurig violated a fiduciary duty it owed as attorneys for IFT.  The breach of fiduciary duty, if any, arose
from acts or omissions in New York, where Greenberg Traurig=s offices were located and its
attorneys practiced law.  It is New York,
not Texas, that has the keen interest in disciplining attorneys practicing law
in New York.  New York=s strong interest in regulating the
conduct of its lawyers, and the undeniable connection between that interest and
the issues in this case, outweigh any interest Texas might have vis a vis the
Investors= fraud-based claims.  This strongly suggests that New York has a
more significant relationship to this particular issue.

Generally speaking, tort law policies influence standards and
procedures used to determine liability, fix compensation, and deter tortious
conduct.  The differing degrees of
interest that the states have in addressing tort law policies necessarily
impact the conflict- of-laws analysis. 
The trial court did not recognize New York=s strong interest in seeing that New
York attorneys are properly regulated in accordance with New York law, opting
instead to look to Texas law on professional misconduct.  Texas has no policy or interest in regulating
the communications occurring in New York between New York lawyers and their
non-Texas clients, nor any interest in defining the ethical requirements for
attorney-client disclosures in New York. 
Likewise, Texas has no interest in applying its law in order to
implement the policy reflected in New York=s disciplinary rules or other law
governing the conduct of New York lawyers practicing in New York.








Fairness is a significant consideration in the
conflict-of-laws analysis.  A court
should not apply its own law, even when the forum state has an interest in it
doing so if the application of the forum state=s law would be unfair to the party
against whom it is to be applied. 
Clearly, it would be unfair to apply the rules of professional conduct
governing Texas lawyers to New York lawyers who are neither licensed in Texas
nor practicing in the state.  The
selection of New York law for the Investors= fraud claims based on an alleged
fiduciary duty arising out of an attorney-client relationship furthers the
relevant factors stated in Section 6 of the Restatement.  Applying these factors, it is manifest that
the law of New York, not Texas, should govern the Investors= fraud claims that are based on a
fiduciary duty owed by New York lawyers to their clients.

Under the Amost significant relationship@ test, Texas lacks the contacts with,
or interests in, the litigation that could support a finding that it has the
most significant relationship.  While it
is arguable that Texas has some relationship to the transactions at issue, it
does not have the dominant or most significant relationship necessary to
displace the law of New York.  Though
Texas has some interest in seeing that harms occurring within its borders are
redressed, the actions and omissions of Greenberg Traurig did not occur in
Texas.  In any event, this interest must
yield when another state, such as New York, has a more significant relationship
to the matters in dispute. 

The factors delineated in Section 6, to which Section 148(1)
refers, on balance point to the application of New York law.  Considering all of the factors, Texas= interest is far less compelling than
that of New York.  The contacts with New
York are greater in number and are more qualitatively significant than those of
Pennsylvania or Texas.  Both the volume
and weight of contacts point toward New York law.  Having fully considered the interests of Texas,
Pennsylvania, and New York in light of the relevant factors, we conclude that
New York has the most significant relationship to the transactions and to the
parties.  New York law should therefore
govern the Investors= fraud-based claims. 
Accordingly, we hold that the trial court erred in applying Texas
substantive law to the Investors= fraud-based claims. 

IV.  New York Blue Sky Laws








Greenberg Traurig asserts the
Investors cannot maintain a private statutory claim for securities fraud under
New York law.  We agree.  New York=s Blue
Sky Laws, commonly known as the Martin Act, prohibit various fraudulent and
deceitful practices in the distribution, exchange, sale, and purchase of
securities.  CPC Int=l, Inc.
v. McKesson Corp., 70 N.Y.2d 268, 519 N.Y.S.2d 804, 806B07, 514
N.E.2d 116, 118 (1987) (citing Gen. Bus.
Law ' 352-c).  However, unlike the Texas Securities Act, New
York=s Martin
Act provides for neither an express nor an implied private claim.  Pahmer v. Greenberg, 926 F. Supp. 287,
302 (E.D.N.Y. 1996), aff=d sub.
nom, Shapiro v. Cantor, 123 F.3d 717 (2d Cir.1997); Cohen v. Prudential-Bache
Secs., Inc., 713 F. Supp. 653, 664 (S.D.N.Y. 1989); CPC Int=l, Inc., 519
N.Y.S.2d at 807, 514 N.E.2d at 118. 
Instead, New York courts have observed that the purpose of Section 352-c
of the Martin Act 

was to create a statutory
mechanism in which the Attorney General would have broad regulatory and
remedial powers to prevent fraudulent securities practices by investigating and
intervening at the first indication of possible securities fraud on the public
and, thereafter, if appropriate, to commence civil or criminal prosecution; and
that consistency of purpose with the statute includes consistency with this
enforcement mechanism.  

 

CPC Int=l, Inc., 519
N.Y.2d at 807, 514 N.E.2d at 119.  Thus,
the Investors cannot maintain a statutory claim for securities fraud under New
York law.  Accordingly, we sustain this
issue.

V.  Statutory Fraud

Greenberg Traurig also argues
that, with the application of New York law, the Investors cannot maintain a
claim for statutory fraud under Texas law. 
We agree.  The jury found
Greenberg Traurig liable for statutory fraud under Section 27.01 of the Texas
Business and Commerce Code. See  Tex. Bus. & Com. Code Ann. ' 27.01
(Vernon 2002).  However, in light of our
determination that New York law governs this case, the Investors cannot
maintain a statutory claim under Section 27.01 of the Texas Business and
Commerce Code.  Therefore, we sustain
this issue.  

VI. 
Common-Law Fraud








Greenberg
Traurig further asserts it had no duty under New York law to make certain disclosures
and, thus, cannot be held liable for common-law fraud.  The jury charge on fraud was based on the
alleged failure to disclose a material fact. 
The fraud question further instructed the jury that the duty to disclose
a material fact could be based on one of two circumstances.  The first is a fiduciary relationship.  With respect to a fiduciary relationship, the
jury charge provided that a duty to disclose may arise in the following
circumstance: 

If a relationship of trust
and confidence exists between the plaintiff and defendant.  Such a relationship exists if the plaintiff
justifiably expects the defendant to act in the plaintiff=s best interest.  A plaintiff=s subjective trust and
feelings alone do not justify transforming arm=s length dealings into a
relationship of trust and confidence.  To
impose such a relationship in a business transaction, the relationship must
exist prior to, and apart from, the agreement made the basis of the suit.

 

With regard to the second
circumstance, applicable in the case of an attorney, based on Rule 4.01(b) of
the Texas Disciplinary Rules of Professional Conduct, the jury charge stated:

In representing a client,
a lawyer may not knowingly fail to disclose a material fact to a third person
when disclosure is necessary to avoid making the lawyer a party to a criminal
act or knowingly assisting a fraudulent act perpetrated by a client.[19]  

A.  No Duty to Disclose








Greenberg Traurig asserts that
under New York law, it is not liable for common-law fraud because attorneys have
no duty to disclose a client=s fraud
to a third party in the absence of an attorney-client relationship with the
third party.  To establish fraudulent
concealment under New York law, the plaintiff must show (1) the defendant
failed to disclose material information that it had a duty to disclose; (2) the
defendant intended to defraud the plaintiff thereby; (3) the plaintiff
reasonably relied upon the representation; and (4) the plaintiff suffered
damages as a result of the reliance.  Stolow
v. Greg Manning Auctions, Inc., 258 F. Supp. 2d 236, 248 (S.D.N.Y. 2003)
(quoting Bermuda Container Line Ltd. v. International Longshoremen=s Assoc.,
AFL-CIO, 192 F.3d 250, 258 (2d Cir. 1999) (quoting Banque Arabe et
Internationale D=Investissement
v. Maryland Nat=l Bank, 57 F.3d
146, 153 (2d Cir. 1995)).  

A claim of fraud based on
fraudulent omission can be maintained only when the defendant had a duty to
disclose the omitted material information. 
Frontier-Kemper Constructors, Inc. v. American Rock Salt Co., 224
F. Supp. 2d 520, 529 (W.D.N.Y. 2002); Schlaifer Nance & Co. v. Estate of
Warhol, 927 F. Supp. 650, 660 (S.D.N.Y. 1996), aff=d, 119
F.3d 91 (2d Cir. 1997); Morin v. Trupin, 711 F. Supp. 97, 103 (S.D.N.Y.
1989).  Under New York law, a duty to
disclose in a business transaction arises in three circumstances: (1) when one
party makes a partial or incomplete statement that requires clarification; (2)
when the parties are in a fiduciary or confidential relationship; and (3) when
one party possesses superior knowledge, not readily available to the other, and
knows that the other is acting on the basis of mistaken knowledge.  Banque Arabe et Internationale D=Investissement, 57 F.3d
at 155; Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.
1993); Stolow, 258 F. Supp. 2d at 248; Manely v. AmBase Corp.,
126 F. Supp. 2d 743, 755B56
(S.D.N.Y. 2001). 

            AHistorically,
fiduciary relationships include: trustee to beneficiary; guardian to ward;
agent to principal; attorney to client; executor to legatees or beneficiaries;
partner to partner; corporate directors or officers to the corporation;
majority shareholders to other shareholders; and bailor to bailee.@  Langford v. Roman Catholic Diocese of
Brooklyn, 177 Misc. 897, 900 n.8, 677 N.Y.S.2d 436, 438 n.8 (N.Y. Sup. Ct.
1998), aff=d, 71
A.D.2d 494, 705 N.Y.2d 661 (N.Y. App. Div. 2000) (citations omitted).  No fiduciary relationship exists between
attorneys and third parties in the absence of a contractual relationship
between them.  Alpert v. Shea, Gould,
Climenko & Casey, 160 A.D.2d 67, 73, 559 N.Y.S.2d 312, 315 (N.Y. App.
Div. 1990).  








A fiduciary relationship may also
exist when one party reposes confidence in another and reasonably relies on the
other=s
superior expertise or knowledge.  WIT
Holding Corp. v. Klein, 282 A.D.2d 527, 529, 724 N.Y.S.2d 66, 68 (N.Y. App.
Div. 2001); see also In re Windsor Plumbing Supply Co., 170 B.R. 503,
525 (Bankr. E.D.N.Y. 1994) (explaining A[f]iduciary
relationship is one founded on trust or confidence reposed by one person in the
integrity and fidelity of another@).  Generally, an arms-length business
transaction does not give rise to a fiduciary duty absent extraordinary
circumstances.  ESI, Inc. v. Coastal
Power Prod. Co., 995 F. Supp. 419, 434 (S.D.N.Y. 1998); K.M.L. Labs.,
Ltd. v. Hopper, 830 F. Supp. 159, 168 (E.D.N.Y. 1993); see also WIT
Holding Corp., 282 A.D.2d at 529, 724 N.Y.S.2d at 68 (observing that even
though plaintiff and defendant had socialized on several occasions, were
business acquaintances, and had worked together on a joint project while part
owners of, and working for, different brokerage firms, arm=s-length
transaction was at issue and therefore no fiduciary relationship existed).  Though a confidential relationship may arise
between parties to a business relationship, Athe
requisite high degree of dominance and reliance must have existed prior to the
transaction giving rise to the alleged wrong, and not as a result of it.@  Societe Nationale D=Exploitation
Industrielle des Tabacs et Allumettes v. Salomon Bros. Int=l Ltd., 251
A.D.2d 137, 138, 674 N.Y.S.2d 648, 649 (N.Y. App. Div. 1998), appeal denied,
95 N.Y.2d 762, 715 N.Y.S.2d 215, 738 N.E.2d 263 (N.Y. 2000); Elghanian v.
Harvey, 249 A.D.2d 206, 671 N.Y.S.2d 266 (N.Y. App. Div. 1998).  








Greenberg Traurig did not serve
as counsel to the Investors and shared no attorney-client relationship with
them.  Thus, there was no formal
fiduciary relationship between the Investors and Greenberg Traurig giving rise
to a duty to disclose.  To prevail on a
fraud claim premised on a fiduciary duty to disclose in the absence of a formal
fiduciary relationship, the Investors must establish that an informal fiduciary
relationship existed.  However, the
Investors have not shown that they had any relationship with Greenberg
Traurig prior to and apart from their purchase of the IFT stock.  Therefore, because no fiduciary relationship,
either formal or informal, existed between the parties, Greenberg Traurig had
no duty to disclose on that basis.[20]  

If there is no fiduciary
relationship, a party has a duty to disclose only when one party has superior
knowledge not readily available to the other party.  Ceribelli v. Elghanayan, 990 F.2d 62,
64 (2d Cir. 1993).  A duty to disclose
based on superior knowledge A>ordinarily
arises only in the context of business negotiations where parties are entering
a contract.=@  Stolow, 258 F. Supp. 2d at 248 n.13
(quoting Ray Larsen Assocs., Inc. v. Nikko Am., Inc., 1996 WL 442799, at
*5 (S.D.N.Y. Aug. 6, 1996)).  A duty to
disclose will not be imposed unless there is evidence the defendant was on
notice that the plaintiff was acting upon a mistaken belief based on inferior
information.  Morin, 711 F. Supp.
at 103 (quoting Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,
601 F. Supp. 770, 773 (S.D.N.Y. 1985)).  








Under New York law, an attorney
has no duty to disclose knowledge that his client is making a fraudulent
statement to a third party when there is no attorney-client relationship
between the attorney and the third party. 
Schlaifer v. Nance & Co., 927 F. Supp. at 661; see also
Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 494 (S.D.N.Y. 2003) (stating
that without independent duty to disclose, mere inaction does not amount to
substantial assistance for aider and abettor liability; lawyers do not have
duty to Ablow the
whistle@ on their
clients); Morin, 711 F. Supp. at 113 (holding that claim by third party
that attorneys did not Ablow
whistle on their clients@ does not
constitute actionable aiding and abetting); King v. George Schonberg &
Co., 233 A.D.2d 242, 243, 650 N.Y.S.2d 107, 108 (N.Y. App. Div. 1996)
(holding that in absence of fiduciary relationship between plaintiff and
brother=s
attorneys giving rise to duty to disclose, attorneys= silence
did not amount to substantial assistance required for aider or abettor
liability in fraud).  More specifically,
a law firm is not under an ethical obligation to disclose what knowledge it
might have concerning its client=s alleged
impending fraud.  National
Westminister Bank U.S.A. v. Weksel, 124 A.D.2d 144, 148, 511 N.Y.S.2d 626,
630 (N.Y. App. Div.), appeal denied, 70 N.Y.2d 604, 519 N.Y.S.2d 1027,
513 N.E.2d 1307 (N.Y. 1987).  Indeed, New
York Disciplinary Rule 4-101(C)(3) Aprovides
only that >A lawyer may reveal . . .
the intention of his client to commit a crime . . .=@  Id. at n.* (quoting Code of Prof=l Responsibility, DR 4-101 (C)(3)) (emphasis in
original).  Thus, under New York law,
Greenberg Traurig was under no duty to make any such disclosures to the
Investors in the absence of an attorney-client relationship between the law
firm and the Investors.  

B.  No Private Claim for Violation of
Disciplinary Rules








The court=s charge
also allowed the jury to find a duty to disclose based on disciplinary
rules.  Although the violation of the
Code of Professional Responsibility may lead to disciplinary proceedings
against an attorney, it does not provide a private claim against an attorney
under New York law.  Hashemi v. Shack,
609 F. Supp. 391, 397 (S.D.N.Y. 1984); Shapiro v. McNeill, 92 N.Y.2d 91,
677 N.Y.S.2d 48, 50, 699 N.E.2d 407, 409 (N.Y. 1998); Weintraub v. Phillips,
Nizer, Benjamin, Krim & Ballon, 172 A.D.2d 254, 568 N.Y.S.2d 84, 85
(N.Y. App. Div. 1991); Brainard v. Brown, 91 A.D.2d 287, 289, 458
N.Y.S.2d 735, 736 (N.Y. App. Div. 1983), overruled on other grounds by
Santulli v. Englert, Reilly & McHugh, P.C., 164 A.D.2d 149, 563
N.Y.S.2d 548 (N.Y. App. Div. 1990). Thus, there is no liability for an attorney
to third parties outside the traditional tort or contract claims.  See Drago v. Buonagurio, 46 N.Y.2d
778, 413 N.Y.S.2d 910, 911, 386 N.E.2d 821, 822 (N.Y. 1978) (Athe
courts have not recognized any liability of the lawyer to third parties
therefor where the factual situations have not fallen within one of the
acknowledged categories of tort or contract liability@); Crandall
v. Bernard, Overton & Russell, 133 A.D.2d 878, 879, 520 N.Y.S.2d 237,
238 (N.Y. App. Div. 1987), appeal dism=d, denied, 70
N.Y.2d 940, 524 N.Y.S.2d 672, 519 N.E.2d 618 (N.Y. 1988) (noting that New York
does not recognize liability of lawyer to third parties where factual situation
does not fall within one of acknowledged categories of tort and contract
liability).  Therefore, even if Greenberg
Traurig had violated a New York disciplinary rule, the Investors still would not
be able to maintain a claim for common-law fraud based on such a violation.[21]  

We conclude that under New York
law, the Investors cannot maintain a fraud claim against Greenberg Traurig for
not disclosing any past fraud allegedly committed by IFT or for not revealing
that IFT allegedly intended to commit fraud. 
We sustain this issue. 

VII.  Conspiracy








We now address the Investors=
allegations that Greenberg Traurig conspired to commit fraud.  Under Texas law,[22]
the elements of civil conspiracy are (1) a combination of two or more persons;
(2) an object to be accomplished (an unlawful purpose or a lawful purpose by
unlawful means); (3) a meeting of the minds on the object or course of action;
(4) one or more unlawful, overt acts; and (5) damages as the proximate
result.  Insurance Co. of N. Am.,
981 S.W.2d at 675.  

A.  Specific Intent

A>[C]ivil
conspiracy requires specific intent= to agree
>to
accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful
means.=@  Juhl v. Airington, 936 S.W.2d 640, 644
(Tex. 1996) (quoting Triplex Communications, Inc. v. Riley, 900 S.W.2d
716, 719 (Tex. 1995)).  The gist of civil
conspiracy is the injury the conspirators intended to cause.  Firestone Steel Prods. Co. v. Barajas,
927 S.W.2d 608, 614 (Tex. 1996).  Thus,
proof of a joint intent to engage in the conduct that resulted in the injury is
not sufficient to establish civil conspiracy. 
See Juhl, 936 S.W.2d at 644. 
Moreover, the parties must be aware of the harm or the wrongful conduct
at the beginning of the combination or agreement; parties cannot agree,
expressly or tacitly, to commit a wrong about which they have no
knowledge.  Firestone Steel Prods. Co.,
927 S.W.2d at 614; Schlumberger Well Surveying Corp. v. Nortex Oil & Gas
Corp., 435 S.W.2d 854, 857 (Tex. 1968).[23]  

Jury
Charge








Greenberg Traurig contends the
trial court erroneously omitted the specific intent requirement from the jury
charge and, therefore, the Investors were not required to prove that Greenberg
Traurig specifically intended to cause an injury or that it agreed to any
unlawful conduct.  In instructing the
jury on conspiracy, the trial court stated: 


A
conspiracy is a combination of two or more persons to commit an unlawful act or
to commit a lawful act by unlawful means.

To
be part of a conspiracy, the conspirator and another person or persons must
have had knowledge of, agreed to, and intended a common objective or course of
action that resulted in damages to one or more of the Plaintiffs.  One or more persons involved in the conspiracy
must have performed some act or acts to further the conspiracy.

 

Greenberg Traurig complains the
charge allowed the jury to conclude that Greenberg Traurig could be part of a
conspiracy involving two or more defendants as long as it shared any Acommon
objective or course of action,@
including a lawful one, Athat
resulted in damages to one or more of the [Investors]@ even if
Greenberg Traurig did not intend such a result. 


Greenberg Traurig, however, did
not object at trial to the lack of specific intent in the jury charge.  To preserve error, a party must timely object
to the submission of an improper question, instruction, or definition.  Tex.
R. Civ. P. 274.  Greenberg Traurig
has not cited to any objection it lodged regarding the jury question on conspiracy.  Moreover, our review of the record does not
reveal that any such objection was raised in the trial court. Therefore, we
find Greenberg Traurig has waived this complaint on appeal.  See Melendez v. Exxon Corp., 998
S.W.2d 266, 281 (Tex. App.CHouston
[14th Dist.] 1999, no writ) (holding appellant, who neither raised objection to
instruction during charge conference nor obtained ruling, failed to preserve
complaint for appellate review).[24]









Legal
Sufficiency

Greenberg Traurig also complains
the evidence is legally insufficient to support the jury=s finding
on conspiracy to defraud.[25]  When reviewing the legal sufficiency of the
evidence, we consider only the evidence and inferences tending to support the
jury=s
findings, and disregard all contrary evidence and inferences.  Wal-Mart Stores, Inc. v. Canchola, 121
S.W.3d 735, 739 (Tex. 2003) (per curiam). 
A no-evidence challenge will be sustained when (1) the record discloses
a complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
scintilla; or (4) the evidence conclusively establishes the opposite of the
vital fact.  Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998).  A no-evidence point will be rejected if more
than a scintilla of evidence supports the finding.  Canchola, 121 S.W.3d at 739.  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int=l, Inc.
v. National Union Fire Ins. Co. of Pittsburgh, P.A., 77
S.W.3d 253, 262 (Tex. 2002).  








Greenberg Traurig claims it
cannot be held liable for conspiracy based on the failure to disclose client
confidences.  Under Texas law, an
attorney can be held liable for conspiracy to defraud if he knowingly agrees to
defraud a third person.  Mendoza v.
Fleming, 41 S.W.3d 781, 787 (Tex. App.CCorpus
Christi 2001, no pet.); Querner v. Rindfuss, 966 S.W.2d 661, 666 (Tex.
App.CSan
Antonio 1998, pet. denied); Bernstein v. Portland Savs. & Loan Ass=n, 850
S.W.2d 694, 706 (Tex. App.CCorpus
Christi 1993, writ denied), overruled on other grounds by Crown Life Ins.
Co. v. Casteel, 22 S.W.3d 378 (Tex. 2000); Likover v. Sunflower Terrace
II, Ltd., 696 S.W.2d 468, 472 (Tex. App.CHouston
[1st Dist.] 1985, no writ).  When an
attorney, acting for his client, participates in fraudulent activities, his
conduct is Aforeign to the duties of an
attorney.@ 
Poole v. Houston & T.C. Ry. Co., 58 Tex. 134, 137
(1882).  AEvidence
of an attorney=s knowledge of the fraudulent
nature of his and others= actions
and intent to share in the fruits of that fraud can defeat a claim that the
attorney was ignorant of fraud and acting solely at the clients=
direction and can expose the attorney to liability for conspiracy to defraud.@  Bernstein, 850 S.W.2d at 706.  However, mere knowledge and silence are not
sufficient to establish conspiracy.  Id.  Instead, because of the attorney=s duty to
preserve client confidences, there must be some indication that the attorney
agreed to the fraud.  Id.  

The Investors claim Greenberg
Traurig entered into an agreement to accomplish a legal purpose (an initial
public offering) by illegal means, which they claim involved bringing other
lawyers, auditors, and investment bankers (necessary to create the illusion of
a forthcoming initial public offering) into IFT=s
service.  The Investors further claim
Greenberg Traurig entered into a second agreement to accomplish an illegal
purpose (fraudulently obtaining cash to sustain IFT), which involved assisting
J. Summers in his scheme to defraud investors by concealing his past, preparing
various documents, and using the illusion of an impending initial public
offering.  In support of their contention
that Greenberg Traurig conspired to defraud them, the Investors rely on
Greenberg Traurig=s alleged
knowledge of, but failure to disclose, J. Summers= and IFT=s prior
and then current problems, certain of which would prevent the initial public
offering from ever occurring. 








SEC Injunction

The Investors assert Greenberg
Traurig knew of the SEC injunction permanently enjoining J. Summers from
selling unregistered securities. 
Kirshenberg testified he did not know about the SEC injunction until
February 1998, when Ernst & Young informed him after discovering it while
conducting its due diligence on IFT.  

At trial, however, documents from
Arthur Andersen=s files
were admitted into evidence, one of which included a February 11, 1980 release
concerning an SEC action against J. Summers alleging that he, among others, had
sold unregistered securities in violation of the registration provisions of
federal securities law.  On June 5, 1996,
a copy of the SEC release was faxed to Thomas Duffy of Arthur Andersen from
another Arthur Andersen employee.  Thus,
by June 1996, Arthur Andersen knew J. Summers had problems with the SEC.  In the October 14, 1996, Arthur Andersen
termination letter, Duffy made reference to Atwo
matters which surfaced during the conduct of [Arthur Andersen=s] due
diligence@ which he previously had
discussed with J. Summers in July 1996. 
Kirshenberg testified that in November 1996, Greenberg Traurig partner
Richard Zaroff spoke to Arthur Andersen on behalf of IFT in an effort to get
Arthur Andersen to reconsider terminating its relationship with IFT.  Kirshenberg conducted a Westlaw computer
search on the same day Zaroff spoke to Arthur Andersen.  The Investors assert Kirshenberg searched
Westlaw for the SEC injunction. Kirshenberg testified his research could have
been related to either the trademark matter Greenburg Traurig was then handling
or the Mississippi lawsuit mentioned in the Arthur Andersen termination
letter.  








Moreover, on October 30, 1996,
about the time that Greenberg Traurig=s
representation of IFT commenced, J. Summers wrote Zaroff, A[w]e
would like to move forward on cleaning up the >old
baggage= and working on the [initial
public offering].@[26]  The jury reasonably could have inferred from
the evidence that Greenberg Traurig knew of the SEC injunction from speaking
with Arthur Andersen and from J. Summers=
disclosure of Aold baggage.@  

Sale of Securities in
Violation of Securities Laws

Related to Greenberg Traurig=s
knowledge that J. Summers was permanently enjoined from selling unregistered
securities is the Investors=
assertion that Greenberg Traurig knew J. Summers was selling unregistered
securities, i.e., IFT stock, in violation of the SEC injunction.  Kirshenberg testified he did not know J.
Summers was selling stock in IFT until February 1998.  Kirshenberg also testified he first became
aware of J. Summers= sales of
stock in IFT when the lawsuit in Maine was filed in late spring or early summer
of 1998.  

The Investors argue Kirshenberg
knew J. Summers was selling unregistered securities because of Kirshenberg=s own
ownership of stock in IFT and its two predecessor companies, AquaTech and
Nutritech.  Kirshenberg purchased 17,500
shares in AquaTech in 1991; after AquaTech went into bankruptcy, Kirshenberg
was issued 17,500 shares in Nutritech in 1993; after Nutritech failed,
Kirshenberg was issued 17,500 IFT shares in 1994.  In a letter dated September 20, 1996, J.
Summers announced to IFT shareholders that they had Avoted
overwhelmingly@ to increase IFT=s shares
from 25 million to 30 million.  The
letter further stated that each IFT shareholder was being granted Arights to
buy additional shares, up to 5% of your present holdings at $5.00 per share.@  








The Investors also contend
Greenberg Traurig knew there were too many unaccredited investors for a
nonpublic company.[27]  According to J. Summers=
testimony, Kirshenberg Aknew all
along how many shareholders there were.@  J. Summers stated that the IFT shareholder
list was accessible to Athe
lawyers,@ and AKirshenberg=s firm@ wanted
copies of all of IFT=s
files.  Kirshenberg testified the first
time he saw the IFT shareholder list was when IFT=s Tyler
Carlucci showed it to him in October 1998. 
Kirshenberg, however, also testified that he knew there were anywhere
from 500 to 1,000 IFT shareholders Afrom the
beginning of the engagement.@  Finally, the notes to the report on the
audited financial statements for the fiscal year ending March 31, 1996, issued
in spring of 1997, state IFT=s stock Amay have
been issued without compliance with or exemption from certain securities
registration and disclosure acts.@  Greenberg Traurig billing records indicate
that the law firm reviewed the audited reports for IFT=s
financial statements.  A March 20, 1997
Greenberg Traurig billing entry states, AReview of
Audit Report and Financial Statements issued by Parente Randolph.@  A March 21, 1997 Greenberg Traurig billing
entry similarly states, AConference
with Payette - continuing review of financial statements and related issues.@  

Based on the above-cited
evidence, the jury reasonably could have inferred Greenberg Traurig knew that
J. Summers was selling unregistered securities in violation of the SEC injunction
and that IFT had too many shareholders for a nonpublic company.  

Cost of IFT=s
Rescission Offer

The Investors assert Greenberg
Traurig knew of the original $16 million figure initially estimated as the
amount necessary to pay for the rescission offer, which was a substantial
liability against IFT.  The Investors
argue Greenberg Traurig knew that unless IFT dealt with the $16 million
liability, the company would not be able to obtain a Aclean@ auditor=s opinion
necessary for an initial public offering. 


In a July 7, 1997 memorandum to
J. Summers, Gerald Chalphin of the Ellsworth Wiles law firm stated that IFT
would have to make a rescission offer to its current shareholders, suggesting
that IFT should set aside more than $16 million to cover the cost of the
rescission offer.[28]  Several months later, on December 9, 1997,
Chalphin wrote to J. Summers, setting forth the rescission offer amount as
$110,000, and explaining: 








[w]ith the exception of
sixteen investors who we understand are still considering whether or not to
accept the rescission offers which were made to them (at what we understand IFT
believes will be an aggregate potential cost to it of less than $110,000), we
understand that each of those investors chose to reject the rescission offer
which was made to them.  

 

Chalphin=s letter
makes no mention of the previous $16 million figure.  Two days later, J. Summers faxed to
Kirshenberg a copy of Chalphin=s
December 9, 1997 letter setting forth the $110,000 rescission offer amount, and
requested that Kirshenberg review it and give J. Summers his thoughts.  

The Investors assert it is
reasonable to infer that because J. Summers forwarded the letter regarding the
$110,000 figure, Greenberg Traurig also received a copy of the memo setting
forth the $16 million figure.  The
Investors also assert Greenberg Traurig knew of the original $16 million
rescission offer figure because J. Summer testified that he discussed Aeverything@ with
Kirshenberg and forwarded all documents to Greenberg Traurig.  The jury could have made the reasonable
inference that, based on Greenberg Traurig=s
relationship with IFT, the law firm knew of the original $16 million estimated
rescission offer amount and that any discussion of the December 9, 1997 letter
would necessarily include a discussion of the previous $16 million figure.  

Efforts to Help IFT Secure
an Underwriter, Independent Auditor, and Financing

The Investors also complain that
Greenberg Traurig helped IFT find an independent auditor and underwriter, and
helped secure financing and, through these efforts, attempted to keep the
possibility of an initial public offering alive even though it knew that an
initial public offering could not occur. 
Greenberg Traurig does not dispute that it was involved in efforts to
find an independent auditor and an underwriter for the initial public offering
and to assist IFT in securing financing, but maintains that these efforts were
only a part of its duties in representing IFT. 
However, Kirshenberg did not necessarily inform those potential
independent auditors, underwriters, or lenders of IFT=s or J.
Summers=
problems. 








In late 1997 and early 1998,
Kirshenberg assisted IFT in trying to get Ernst & Young on board as IFT=s
independent auditor.  Ernst & Young
was no longer interested after discovering the SEC injunction while conducting
its due diligence on IFT.  In March 1998,
Kirshenberg contacted Bear Stearns & Co., an investment house, on behalf of
IFT to discuss the possibility of it underwriting the initial public
offering.  Kirshenberg testified that he
did not tell Bear Stearns about the SEC injunction or that Arthur Andersen had
resigned due to J. Summers= failure
to disclose information, but instead, he informed Bear Stearns that there were
some problems with J. Summers= Acheckered
past@ and a
new CEO would be stepping in to replace him. 


In the spring of 1998, Greenberg
Traurig introduced investment bank, Josephthal Co., as a potential underwriter
of IFT=s initial
public offering.  In August 1998,
Greenberg Traurig assisted IFT in obtaining a loan from the Bank of
Pennsylvania.  Greenberg Traurig, in an
opinion letter to the bank, represented that there were no existing or pending
actions against IFT that would adversely affect the company.[29]  Finally, in the summer and fall of 1998, when
another Greenberg Traurig client was interested in buying IFT, Greenberg
Traurig asked IFT to sign a waiver of conflict of interest so that Greenberg
Traurig could proceed with its attempt to negotiate the sale.  

Arthur Andersen=s
Resignation








The Investors also complain about
Greenberg Traurig=s
knowledge that Arthur Andersen had resigned as IFT=s
independent auditor due to J. Summers= failure
to disclose a judgment taken against him in Mississippi.  In an October 14, 1996 letter, Thomas Duffy
of Arthur Andersen explained to J. Summers:

In July 1996, I met with
you and Robert [Summers] to discuss two matters which surfaced during the
conduct of our due diligence related to acceptance of Integrated Food
Technologies Corp. (IFT) as a client of our Firm.  In the course of those discussions, I asked
both you and Robert if there were any other matters which I should be aware of
to which both of you responded there were none. 
I am extremely disappointed to have just learned of another matter
(Aqua-Culture Technologies LTD. [J. Summers] vs. Dr. Sandra Holly, Supreme
Court of Mississippi, May 30, 1996).

An independent auditor,
out of necessity, places significant reliance on representations of client
management.  Consequently, when serious
doubts are raised as to the completeness of such representations, there is no
basis for a mutually beneficial professional relationship.  As a result, effective immediately, we hereby
resign as IFT=s independent public
accountants and tax advisors. . . .

 

On May 30, 1996, the Mississippi
Supreme Court, which is mentioned in the Arthur Andersen resignation letter,
affirmed a judgment against J. Summers in a derivative shareholder lawsuit in
which it was found that J. Summers had violated his fiduciary duties and
diverted corporate funds for his own use. 
See Aqua-Culture Techs., Ltd. v. Holly, 677 So.2d 171 (Miss.
1996) (the AHolly case@).  IFT specifically asked Greenberg Traurig to
speak to Arthur Andersen in an attempt to keep the accounting firm from
resigning as IFT=s independent
auditor.  Greenberg Traurig also edited
the script for the November 23, 1996 annual shareholders meeting, suggesting
that with regard to Arthur Andersen=s status
as IFT=s
independent auditor, IFT=s board
members state to the shareholders, A[W]e have
encountered some difficulty with the Andersen group and are exploring a number
of ways to proceed with them or another big 6 firm.@  

Various Lawsuits against
J. Summers and IFT








The Investors further complain
that Greenberg Traurig knew about other lawsuits brought against J. Summers and
IFT in Mississippi, Oklahoma, and Maine. 
It is undisputed that Greenberg Traurig knew of the Mississippi and
Maine lawsuits.[30]  Greenberg Traurig, however, disputes that it
had any knowledge about the Oklahoma lawsuit until October or November 1998,
the time period during which Kirshenberg claims to have learned of it.  In 1997, IFT and J. Summers were sued in
Oklahoma over Athe acquisition by the Plaintiffs
of certain shares of stock . . . in IFT . . .@  J. Summers testified that the Gross McGinley
law firm, not Greenberg Traurig, handled the settlement of the Oklahoma
lawsuit, but that he was certain he had discussed the Oklahoma lawsuit with
Kirshenberg A[b]ecause we discussed everything
with Mr. Kirshenberg.@  There is evidence to support the Investors=
assertion that Greenberg Traurig knew of the Oklahoma lawsuit.  

J. Summers= Personal
Bankruptcy

The Investors contend Greenberg
Traurig knew that J. Summers had filed for personal bankruptcy.  In its opinion affirming the judgment against
J. Summers in the Holly case, the Mississippi Supreme Court observed
that J. Summers was granted a discharge in his personal bankruptcy case on
November 8, 1995.  See Holly, 677
So.2d at 187.  Although Kirshenberg
testified that he first learned of J. Summers= personal
bankruptcy in the context of the present litigation, he also testified that he
had read the opinion in the Holly case early in Greenberg Traurig=s
representation of IFT.  J. Summers also
testified that he discussed his personal bankruptcy with Kirshenberg.  The jury reasonably could have concluded that
Kirshenberg knew J. Summers had filed for personal bankruptcy.  

Failures of Predecessor
Companies








The Investors complain of
Greenberg Traurig=s
knowledge that IFT=s predecessor
companies had failed.  Kirshenberg
testified that he knew that AquaTech had gone into bankruptcy before becoming
Nutritech, and that Nutritech had folded before becoming IFT.  The jury reasonably could have concluded that
Greenberg Traurig knew that IFT=s
predecessor companies had failed.

Disgruntled IFT
Shareholders

The Investors complain that
Greenberg Traurig knew that a group of disgruntled IFT shareholders had accused
J. Summers of fraud.  On October 18,
1996, a group of IFT shareholders informed J. Summers that his representations
regarding IFT=s financial position were not
true and requested that their investments be refunded, or they would take
further action:  

One year ago you provided
information, verbal and written which indicated that IFT was in a strong
position and would be proceeding quickly to set up full-scale production
facilities in Pennsylvania and in Germany, and you personally confirmed that
construction had begun in Germany.  The
plans and financial statements which were presented to us in September 1995 to
use as [a] basis for the decision to invest in IFT (Business Plan R23-1995)
showed over $14MM of booked orders (receivables) and well over $2MM in stated
profits for fiscal year 3/95.  Over the
past year we have learned that none of the above was true when it was presented
to us.  In fact, is still only Apotential,@ as we have determined
from discussions with you, Stan Kron, Don Shoflick, and Joe Barone.

We have repeatedly
requested realistic updates on the company=s progress.  We have waited for over six months to see the
FY 96 financial statements, to no avail.

In view of our
disappointment, and in view of the manner in which our investment in your
company was solicited, we feel that our money should be refunded immediately,
with interest.  Please send a check made
out to each of the undersigned, . . .

Once we receive the funds,
we will consider this matter closed.  If
we do not receive the refunds by October 31, we will retain counsel to pursue
further action and more substantial relief, to the fullest extent of the law,
based on the improprieties and misrepresentations which we believe were
committed by IFT.








Greenberg Traurig does not
dispute that it knew of the disgruntled IFT shareholders.  Kirshenberg testified that IFT brought the
disgruntled shareholders= problem
to Greenberg Traurig=s
attention.  On October 30, 1996, J.
Summers sent to Greenberg Traurig partner Richard Zaroff a copy of his proposed
response to the disgruntled shareholders= demands,
asking for Zasroff=s comments
and further stating, AWe have
no problem rescinding the stock without interest because it is selling at a
higher price now anyway.@[31]  Kirshenberg and Zaroff worked to resolve the
problems with the disgruntled shareholders. 


Greenberg Traurig=s Knowledge
of Work Other Law Firms Were Performing








Greenberg Traurig maintains that
in early 1997, the only legal work it was performing for IFT was work on a
litigation trademark matter.  The
Investors claim that by early 1997, Greenberg Traurig had assumed a supervisory
role over other law firms hired by IFT to act as general counsel (Gross
McGinley) and to handle SEC matters (Ellsworth Wiles).  For example, in December 1997, J. Summers
sent to Kirshenberg a copy of a memo from Ellsworth Wiles regarding the $110,000
rescission offer figure.  J. Summers
testified that he discussed with Kirshenberg the work Ellsworth Wiles was
performing:  AI
discussed it with him because I was anxious to get this SEC matter cleared up
once and for all because everybody agreed it was too broad and it should be
eliminated.@ 
According to J. Summers, Kirshenberg told him to just let Ellsworth
Wiles continue handling the SEC matter instead of Greenberg Traurig taking it
over.  The Investors also rely on J.
Summers=
testimony that Greenberg Traurig received copies of all the records and files,
and that he discussed Aalmost
everything@ with Kirshenberg because AKirshenberg
was sort of a legal confidant.@  The jury reasonably could have inferred that
Greenberg Traurig was aware of the legal work the other law firms were
performing for IFT.  

Analysis

The Texas Supreme Court has
explained that it is not sufficient that the alleged conspirators intended to
engage in the conduct that resulted in the injury.  Triplex Communications, Inc., 900
S.W.2d at 719.  Rather, to recover on
their claim for conspiracy to defraud, the Investors were required to show that
Greenberg Traurig specifically intended to agree to accomplish an unlawful
purpose or lawful purpose by unlawful means. 
See Juhl, 936 S.W.2d at 644. 
However, because of an attorney=s duty to
preserve client confidences, there must be Aindications@ that the
attorney agreed to the fraud.  Thus, an
attorney may be held liable for conspiracy to defraud if he knowingly agrees to
defraud a third party.  Bernstein,
850 S.W.2d at 706.  Although conspiracy
may be proved by circumstantial evidence, Aa vital
fact may not be established by piling inference upon inference.@  Schlumberger Well Surveying Corp., 435
S.W.2d at 858.  

The Investors assert there was
(1) an agreement to accomplish a legal purpose (an initial public offering) by
illegal meansCbringing other lawyers as well as
auditors and investment bankers (necessary to create the illusion of a
forthcoming initial public offering) into IFT=s service
and (2) an agreement to accomplish an illegal purpose (fraudulently obtaining
funds to sustain IFT)Cassisting
J. Summers in his scheme to defraud investors by concealing his past, preparing
various documents, and using the illusion of an impending initial public
offering.  








The jury heard evidence from
which it reasonably could have inferred that Greenberg Traurig knew (1) J.
Summers was prohibited from selling unregistered securities by the SEC
injunction; (2) J. Summers was selling unregistered securities in violation of
the SEC injunction; (3) there were more shareholders in IFT than were allowed
for a nonpublic company; and (4) a recision offer was necessary because
unregistered securities had been sold in violation of the SEC injunction.  

There was also evidence that
Greenberg Traurig knew of other lawsuits against IFT and of J. Summers= personal
bankruptcy and the failures of the predecessor companies.  Greenberg Traurig knew Arthur Andersen had
resigned as IFT=s
independent auditor because of J. Summers= failure
to disclose a judgment against him, and other IFT shareholders had accused J.
Summers of fraud.  It was undisputed that
Greenberg Traurig assisted IFT in trying to find an independent auditor, a
lender, and an investment banker to move forward with an initial public
offering, without necessarily disclosing J. Summers= problems
with the SEC, other IFT shareholders, past bankruptcies, or failures of
predecessor companies.  

Finally, even after IFT=s Tyler
Carlucci and Daniel Moran discovered IFT had more shareholders than allowed for
a nonpublic company, which subsequently led to the discovery of J. Summers= other
problems, Kirshenberg did not want to take the information to the SEC.  Moran testified that when he suggested they
go to the SEC, Kirshenberg told him that Moran would be held liable if IFT went
into bankruptcy or anything else that occurred because of going to the
SEC.  

Considering only evidence and
inferences supporting the jury=s
finding, we conclude there is more than a scintilla of evidence to support a
finding that Greenberg Traurig agreed to conspire to commit common-law fraud.








B.  Cause of Damages

Though some defendants were
dismissed on jurisdictional grounds, the remaining individual defendants found
to be part of the conspiracy did not appear at trial and have never challenged
any allegation or finding that a civil conspiracy existed.  Greenberg Traurig contends the evidence is
legally insufficient to prove that any alleged common objective or course of
action resulted in damages to any of the Investors.  More specifically, Greenberg Traurig argues
nothing it did in late 1996 caused the Investors to invest in IFT a year later
because by the spring of 1997, (1) IFT=s
directors were aware of IFT=s
noncompliance with securities law; (2) IFT=s
shareholders had been informed of the noncompliance in the company=s 1996
annual report (although not the amount of potential liability); and (3) IFT had
engaged the Gross McGinley law firm to bring the company into compliance, and
the Ellsworth Wiles law firm to handle the rescission offer.  

An alleged conspirator is not
liable for an act not performed in furtherance of the conspiracy.  Carroll v. Timmers Chevrolet, Inc.,
592 S.W.2d 922, 926 (Tex. 1979). 
However, once a civil conspiracy is proved, each conspirator is
responsible for all acts done by any of the conspirators in furtherance of the
conspiracy.  Akin v. Dahl, 661
S.W.2d 917, 921 (Tex. 1983); In re Arthur Andersen, LLP, 121 S.W.3d 471,
482 (Tex. App.CHouston [14th Dist.] 2003, orig.
proceeding).  A finding of civil
conspiracy further imposes joint and several liability on all conspirators for
actual damages resulting from acts in furtherance of the conspiracy.  Carroll, 592 S.W.2d at 925.  A[C]ivil
conspiracy >came to be used to extend
liability in tort . . . beyond the active wrongdoer to those who have merely
planned, assisted, or encouraged his acts.=@  Id. at 925B26
(quoting W. Prosser, Handbook of the Law
of Torts ' 46, at 293
(1971)).  








The evidence is legally sufficient
to support a finding that Greenberg Traurig agreed to be a part of the civil
conspiracy to commit common-law fraud. 
Specifically, the jury heard evidence that Greenberg Traurig (1) knew of
J. Summers= myriad of problems with the SEC,
other IFT shareholders, and personal bankruptcy, (2) knew of IFT=s
financial position and potential liability due to the necessity of the
rescission offer, (3) knew that predecessor companies of IFT had failed, and
(4) actively pursued financing for IFT and underwriting for the initial public
offering.  The jury also heard evidence
of J. Summers= misrepresentations to the
Investors with regard to the status of the impending initial public offering,
IFT=s
financial health, how the funds invested would be used, and which investment
bank allegedly would be underwriting the initial public offering.  After reviewing all evidence and inferences
in favor of the jury=s
findings, we conclude the evidence is legally sufficient to support a finding
that Greenberg Traurig was part of a civil conspiracy and that fraudulent acts
that caused damage to the Investors were committed by coconspirators in
furtherance of the conspiracy.  

VIII.  Expert Testimony

Greenberg Traurig contends the
trial court erred in admitting expert testimony about the law.  The Investors presented expert testimony
through Joseph Long, a former securities law professor from the University of
Oklahoma College of Law, and James P. Wallace, a former Justice of the Texas
Supreme Court.  

A.  Motion to Strike

As an initial matter, the
Investors assert that Greenberg Traurig did not properly object at trial to the
majority of the Investors= experts=
testimony and, therefore, did not preserve error.  The Investors contend that although Greenberg
Traurig filed a pretrial ADefendant=s Motion
to Strike Plaintiffs=
Designation of Professor Joe Long and Justice James Wallace as Expert
Witnesses,@ the law firm failed to preserve
error because it did not object to the experts=
testimony when such testimony was offered during trial.  Thus, the crux of the Investors= argument
is that Greenberg Traurig=s
pretrial motion to strike was essentially a motion in limine and should be
treated as such.  








A motion in limine is a
procedural device that permits a party to identify, prior to trial, certain
evidentiary rulings the trial court may be asked to make.  Weidner v. Sanchez, 14 S.W.3d 353, 363
(Tex. App.CHouston [14th Dist.] 2000, no
pet.).  The purpose of the motion in
limine is to prevent the other party from asking prejudicial questions or
introducing prejudicial evidence in front of the jury without first asking the
trial court=s permission.  Hartford Acc. & Indem. Co. v.
McCardell, 369 S.W.2d 331, 335 (Tex. 1963); Weidner, 14 S.W.3d at
363.  Because a trial court=s ruling
on a motion in limine preserves nothing for review, a party must object at
trial when the testimony is offered to preserve error for appellate
review.  Hartford Acc, & Indem.
Co., 369 S.W.2d at 335.  However, not
all pretrial motions are motions in limine. 
See Huckaby v. A.G. Perry & Son, Inc., 20 S.W.3d 194, 203
(Tex. App.CTexarkana 2000, pet.
denied).  There is a distinction between
a motion in limine and a pretrial ruling on admissibility.  Id.; see also Norfolk S. Ry. Co. v.
Bailey, 92 S.W.3d 577, 583 (Tex. App.CAustin
2002, no pet.) (stating that A[a]
ruling on a pretrial motion to exclude evidence . . . can be a ruling on the
admission of evidence@).  The trial court has the authority to make a
pretrial ruling on the admissibility of evidence.  Huckaby, 20 S.W.3d at 203; Owens-Corning
Fiberglas Corp. v. Malone, 916 S.W.2d 551, 557 (Tex. App.CHouston
[1st Dist.] 1996), aff=d, 972
S.W.2d 35 (1998). 








The Investors argue a pretrial
motion to exclude testimony is actually treated as a motion in limine.  In support of this contention, the Investors
rely on Clark v. Trailways, Inc., 774 S.W.2d 644 (Tex. 1989).  Trailways involved sanctions imposed
for failing to timely supplement responses to discovery requests.  Id. at 645.  The issue was whether the party opposing the
admission of certain testimony under former Texas Rule of Civil Procedure
215(5) preserved its complaint for appeal by objecting to the trial court.  The trial court denied the opposing party=s motion
for sanctions, which included an objection to the testimony of an undisclosed
witness; no objection was made during trial when the testimony was
offered.  Id. at 647.  The Trailways court held the pretrial
motion for sanctions did not preserve error as to the admission of the
testimony in the absence of any objections having been lodged when the
testimony was offered.  Id. at 647B48.  

The Huckaby court
considered whether the ruling in Trailways applies to all pretrial
matters.  20 S.W.3d at 205.  Distinguishing Trailways, the court of
appeals in Huckaby noted that Trailways involved discovery
sanctions. Id.  Texas Rule of
Civil Procedure 166 provides that a trial court may hold a pretrial conference
to consider written trial objections to exhibits or other such matters as may
aid in the disposition of the action.  Id.
(citing Tex. R. Civ. P. 166(m), (p)).[32]  In such a pretrial hearing, the trial court
can make an order that recites the action taken, and the order shall control
the subsequent course of the case unless modified at trial to prevent manifest
injustice.  Id.  Therefore, Rule 166 suggests that pretrial
rulings are appropriate, but does not suggest that it is necessary to go
through the same procedure during the course of the trial.  Id. 
Consequently, the Huckaby court held the trial court=s ruling
on the pretrial motion to exclude evidence properly preserved error at the time
the evidence was admitted.  Id. at
206.  








In its motion to strike Professor
Long as a testifying expert, Greenberg Traurig argued that Professor Long=s expert
report was based on questions of pure law and his opinions were contrary to
this court=s opinion in Frank v. Bear,
Stearns & Co., 11 S.W.3d 380 (Tex. App.CHouston
[14th Dist.] 2000, no pet.).  Professor
Long=s expert
report addressed issues related only to the Texas Securities Act: (1) whether
IFT made material misrepresentations and omissions in connection with the sale
of IFT securities, (2) whether IFT was liable to the Investors for
misrepresentations and omissions under the Texas Securities Act, and (3)
whether the defendants, other than IFT, were liable under the Texas Securities
Act for misrepresentations and omissions by IFT.  

A review of the record in this
case reveals that after the trial court heard oral arguments on the parties= motions
in limine and the voir dire of the jury on October 30, 2001, it heard Greenberg
Traurig=s motion
to strike Professor Long=s
testimony the next day, October 31, 2001.[33]  At that hearing, Greenberg Traurig argued
Professor Long=s testimony (1) involved
questions of law, (2) was not reliable because it failed to follow precedent,
and (3) would not assist the jury because it is the role of the trial court to
instruct the jury on the law.  After
hearing arguments, the trial court denied Greenberg Traurig=s motion
to strike Professor Long as a testifying expert.[34]  In any event, Greenberg Traurig further
objected to Professor Long=s
testimony and the introduction of certain exhibits at trial.  The trial court also overruled these trial
objections.  








Later in the trial proceedings,
the trial court heard argument on Greenberg Traurig=s motion
to strike former Justice Wallace as a testifying expert.[35]  In this motion, Greenberg Traurig argued the
former Texas Supreme Court justice=s
testimony was not admissible because (1) his opinions concerned malpractice and
professional negligence, neither of which had been alleged against Greenberg
Traurig, and therefore, were irrelevant; (2) his opinions on duty (even if
negligence were at issue) are purely on questions of law; and (3) his opinions
on the duty to disclose are based on incorrect law, i.e., Texas disciplinary
rules rather than New York disciplinary rules. 
In his expert report, which consists of only two pages, former Justice
Wallace opined:

Based on my review, the
above documents, my experience and knowledge of law acquired over forty plus
years of active law practice and Judicial experience, it is my opinion that the
law firm of Greenberg, Taurig, P.C. [sic] and the individual lawyers involved
in this matter were negligent in not informing the various investors
including Robert Moody, Jr., and Daniel Moran of the various acts and wrong
doing [sic] of Jack Summers, Robert Summers and Integrated Food Technologies
Corporation as reflected in the above listed documents.[36]


 

At the hearing on Greenberg
Traurig=s motion
to strike the testimony of these experts, Greenberg Traurig objected to former
Justice Wallace=s
testimony because it (1) was based purely on questions of law, (2) was
unreliable because it was inconsistent with Texas law, and (3) would not assist
the jury.  The trial court denied
Greenberg Traurig=s motion.[37]  Moreover, during former Justice Wallace=s
testimony at trial, Greenberg Traurig again objected, but the trial court
overruled those objections as well.  








We find that Greenberg Traurig
has preserved error with regard to its objections to the expert testimony of
both Professor Long and former Justice Wallace. 
See Tex. R. Evid. 103(a)
(stating A[e]rror may not be predicated
upon a ruling which admits . . . evidence unless . . . a timely objection or
motion to strike appears of record, stating the specific ground of objection,
if the specific ground was not apparent from the context@ and
stating A[w]hen
the court hears objections to offered evidence out of the presence of the jury
and rules that such evidence be admitted, such objections shall be deemed to
apply to such evidence when it is admitted before the jury without the
necessity of repeating those objections@).  Accordingly, we now consider whether the
trial court erred in admitting this evidence.

B.  Standard for Admissibility of Expert
Testimony

The admission of expert testimony
is reviewed under the abuse-of-discretion standard.  Exxon Pipeline Co. v. Zwahr, 88 S.W.3d
623, 629 (Tex. 2002).  The trial court
abuses its discretion when its ruling is arbitrary, unreasonable, or without
reference to any guiding rules or legal principles.  K-Mart Corp. v. Honeycutt, 24 S.W.3d
357, 360 (Tex. 2000) (per curiam).  

The Texas Rules of Evidence
provide for the admission of expert testimony: 


If scientific,
technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as
an expert by knowledge, skill, experience, training, or education may testify
thereto in the form of an opinion or otherwise.

 

Tex. R. Evid. 702.  Thus, for an expert=s
testimony to be admissible, the expert must be qualified and the expert=s opinion
must be relevant to the issues in the case and based upon a reliable
foundation.  Zwahr, 88 S.W.3d at
628.  

C.  Questions of Law

Greenberg Traurig asserts the
trial court erred in allowing the expert testimony of Professor Long and former
Justice Wallace because these witnesses testified on pure questions of
law.  The Investors assert Professor Long
and former Justice Wallace merely testified on mixed questions of law and
fact.  








An expert may state an opinion on
a mixed question of law and fact if the opinion is limited to the relevant
issues and is based on proper legal concepts. 
GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 619B20 (Tex.
1999). An issue involves a mixed question of law and fact when a standard or
measure has been fixed by law and the question is whether the person or conduct
measures up to that standard.  Mega
Child Care, Inc. v. Texas Dep=t of
Protective & Regulatory Servs., 29 S.W.3d 303, 309 (Tex. App.CHouston
[14th Dist.] 2000, no pet.).  Expert
testimony on a mixed question of law and fact must meet the requirements
applicable to expert testimony generally, i.e., it must be helpful to the trier
of fact as required by Texas Rule of Evidence 702.  Louder v. De Leon, 754 S.W.2d 148, 149
(Tex. 1988) (per curiam); Lyondell Petrochemical Co. v. Fluor Daniel, Inc.,
888 S.W.2d 547, 554 (Tex. App.CHouston
[1st Dist.] 1994, writ denied).  An
expert, however, may not testify on pure questions of law.  Mega Child Care, Inc., 29 S.W.3d at
309.  Thus, an expert is not allowed to
testify directly to his understanding of the law, but may only apply legal
terms to his understanding of the factual matters in issue.  Welder v. Welder, 794 S.W.2d 420, 433
(Tex. App.CCorpus Christi 1990, no
writ).  

Greenberg Traurig raises
complaints on appeal with regard to Professor Long=s and
former Justice Wallace=s
testimony concerning the Investors= claims
for alleged violations of the Texas Securities Act, fraud, and conspiracy. In
view of our disposition of the Investors= claims
under the Texas Securities Act, we need only address the expert testimony as it
relates to conspiracy to commit common-law fraud and the underlying tort of
common-law fraud.  

Our review of the record reveals
many instances in which Professor Long testified on questions of law concerning
fiduciary duties and conspiracy.  First,
the Investors= trial counsel read from and
questioned Professor Long about the trial court=s opinion
in the Holly case, which cited Justice Cardozo=s
discussion of duties owed by a fiduciary:








Corporate officers and
directors as fiduciaries owe to their corporation a duty to exercise the utmost
good faith and loyalty.  Fiduciaries, as
Justice Cardoza [sic] put it, must be held to something stricter than the
morals of the marketplace.[38]  

 

Professor Long explained the quote read by the Investors= trial
counsel as an excerpt from the Aclassic
opinion identifying a fiduciary duty.@  Next, the trial court, over Greenberg Traurig=s
objection, admitted into evidence a copy of Section 104.2 of the Texas Pattern
Jury Charge on breach of fiduciary duty. 
From the Pattern Jury Charge, Professor Long testified in detail about
each of the several duties owed by a fiduciary, including an attorney, to a
principal or a client.  Professor Long
also testified at length about the Abasic
rules of conspiracy law@ and Athe
nature of a conspiracy,@
explaining to the jury the actors who are liable in a conspiracy.  Finally, Professor Long spent a considerable
amount of time explaining APonzi
schemes.@








The record also reveals a number
of instances in which former Justice Wallace testified on questions of law. The
vast majority of his testimony, based on his understanding and interpretation
of the Texas Disciplinary Rules of Professional Conduct, was devoted to
explaining to the jury an attorney=s
obligations with regard to disclosure and withdrawal from representation in
various scenarios involving the discovery of a client=s
fraud.  Former Justice Wallace also
testified that the Texas rules of professional conduct are relevant to
establishing the standard of care with regard to the negligence of attorneys.  The former Texas Supreme Court Justice
explained that the only opinion he read before giving testimony was the Texas
Supreme Court=s opinion in McCamish, Martin,
Brown & Loeffler v. F.E. Appling Interests.[39]  He stated that his understanding was that
this case was Athe latest pronouncement from the
Texas Supreme Court@ with
regard to Greenberg Traurig=s duty of
disclosure under the disciplinary rules. 
On cross-examination, former Justice Wallace stated, with regard to his
prior testimony concerning multiple law firms working for the same client, AI=m merely
trying to explain what I think the law is.@  Finally, former Justice Wallace opined on the
difference between the role of the judge and the role of the jury.

Professor Long and former Justice
Wallace also testified as to their understanding of the law.  This they were prohibited from doing.  See Welder, 794 S.W.2d at 433 (stating
expert may not testify as to his understanding of law, but may only apply legal
terms to his understanding of factual matters). 
It is not the role of the expert witness to define the particular legal
principles applicable to a case; that is the role of the trial court.  See Ledbetter v. Missouri Pac. R.R. Co.,
12 S.W.3d 139, 144 (Tex. App.CTyler
1999, pet. denied)  (stating that the
applicability of particular legal principles in a case is a matter of law for
the trial court).  As such, an expert may
not usurp the trial court=s role in
trying the case.  See United States v.
Cross, 113 F. Supp. 2d 1282, 1284 (S.D. Ind. 2000) (stating that A[e]ach
courtroom comes equipped with a >legal
expert,= called a
judge, and it is his or her province alone to instruct the jury on the relevant
legal standards@)
(quotations omitted).  The trial court
erred in allowing Professor Long and former Justice Wallace to testify on
questions of law.  

D.  Reliability








Greenberg Traurig also contends
Professor Long=s and former Justice Wallace=s
testimony was unreliable because it not only ignored the controlling law, but
also was contrary to well-established law. 
Unreliable evidence is of no assistance to the trier of fact and is
therefore inadmissible under Texas Rule of Evidence 702.  E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549, 557 (Tex. 1995). 
The reliability requirement focuses on the principles, research, and
methodology underlying an expert=s
conclusions.  Zwahr, 88 S.W.3d at
629.  However, because it is impossible
to set the criteria for evaluating the reliability of expert testimony in
non-scientific cases such as this, it is within the trial court=s discretion
to determine how to assess reliability.  Weingarten
Realty Invs. v. Harris County Appraisal Dist., 93 S.W.3d 280, 285 (Tex.
App.CHouston
[14th Dist.] 2002, no pet.).  Moreover,
reliability is an issue of admissibility for the trial court, not a weight-of-the-evidence
issue for the fact finder.  See
General Motors Corp. v. Sanchez, 997 S.W.2d 584, 590 (Tex. 1999). 

Professor Long testified that
based on the law firm=s
fiduciary duty to IFT=s board
of directors, Greenberg Traurig owed a duty to disclose J. Summers=
fraudulent activities to the board.  The
Investors essentially assert that any breach of Greenberg Traurig=s duty to
disclose fraud to IFT=s board
resulted in their damages.  However,
Texas law provides otherwise.  AA
corporate stockholder cannot recover damages personally for a wrong done solely
to the corporation, even though he may be injured by that wrong.@  Wingate Hajdik, 795 S.W.2d 717, 719
(Tex. 1990).  The claim Amust be
brought by the corporation.@  Id.; see also Abrams, 498
N.Y.S2d at 783, 489 N.E.2d at 751 (New York). 
Thus, Professor Long=s opinion
about Greenberg Traurig=s
purported fiduciary duties to the Investors was contrary to both Texas and New
York law and unreliable.








Former Justice Wallace based his
testimony on his interpretation of the Texas disciplinary rules, which govern
the conduct of Texas attorneys.  Lawyers
not licensed to practice in Texas are not subject to Texas disciplinary rules: AA lawyer
is subject to the disciplinary authority of this state [Texas], if admitted to
practice in this state or if specially admitted by a court of this state for a
particular proceeding.@  Tex.
Disciplinary R. Prof=l Conduct 8.05(a), reprinted in Tex. Gov=t Code
Ann., tit. 2, subtit. G app. A (Vernon 1998) (Tex. State Bar R. art. X, ' 9); see
also Tex. Comm. on Prof=l Ethics,
Op. 516 (1996) (AWe
interpret the phrase >admitted
to practice in this state= to mean
licensed to practice law in Texas and admitted as a member of the State Bar of
Texas.  The jurisdiction of the State Bar
of Texas does not permit it to take disciplinary action for any violation of
the Texas Disciplinary Rules against any person who is not licensed to practice
law in Texas or who is not specially admitted by a Texas court for a particular
proceeding.@).  Greenberg Traurig=s
attorneys were not licensed to practice law in Texas, and they were not
specially admitted by a Texas court for any particular proceeding relevant to
this case.  Therefore, Texas disciplinary
rules are not applicable to their conduct. 
And, because former Justice Wallace=s
testimony was improperly based on Texas disciplinary rules, it was unreliable.

Former Justice Wallace further
testified that the Texas disciplinary rules are Arelevant
to establish . . . the standard of care, what=s
negligent or not.@  Thereafter, based on his professed knowledge
of the rules of ethics, former Justice Wallace opined Aa
reasonably prudent lawyer@ would be
Afoolish
not to resign@ after learning his client has
not only committed a past fraud, but is continuing to commit fraud.  He further testified that based on Areasonable
care of lawyers@
practicing in Texas, the Areasonable@ lawyer
should disclose to third parties that their services and reputation have been
used to help perpetrate a fraud.  We find
this testimony improper.  Even if
Greenberg Traurig=s
attorneys had been licensed to practice in Texas and, thus, subject to the
Texas disciplinary rules, those rules do not establish the standard of care or
civil liability for attorneys.[40]  Moreover, attorney negligence is not at issue
in this case.  Therefore, it was error
for the trial court to permit former Justice Wallace to testify that the
standard of care for attorneys is based on the Texas disciplinary rules when no
such liability can be based on any violation of those rules.

Finally, former Justice Wallace
testified with regard to Greenberg Traurig=s duty to
disclose, stating that his:

understanding is the
latest pronouncement from the Texas Supreme Court is the McCamish case
that we talked about earlier.  If a
lawyer knows that his services are being used to aid and abet in a wrongful
illegal action, then the lawyer has a duty to make sure it stops immediately
and not -- then to advise the other side about it.








However, the question in the McCamish case concerned whether a
law firm may be liable to a nonclient for negligent misrepresentation.  McCamish, 991 S.W.2d at 788.  Neither fraud nor the failure to disclose was
at issue in that case.  Therefore, any
reference by former Justice Wallace to McCamish in that context is
incorrect and, thus, unreliable.  

E.  Assistance to the Jury

Greenberg Traurig also asserts
the expert testimony of Professor Long and former Justice Wallace did not
assist the jury.  The fact that a witness
has knowledge, skill, expertise, or training does not necessarily mean that the
witness can assist the trier of fact.  Honeycutt,
24 S.W.3d at 360.  Expert testimony
assists the trier of fact when the expert=s
knowledge and experience on a relevant issue are beyond that of the average
juror and the testimony helps the trier of fact understand the evidence or
determine a fact issue.  Id.  Evidence is irrelevant if it bears no
relation to any issue in the case and, therefore, does not assist the jury as
required by Texas Rule of Evidence 702.  Robinson,
923 S.W.2d at 557.  In other words, to be
relevant, the proffered testimony must be Asufficiently
tied to the facts of the case [and] that it will aid the jury in resolving a
factual dispute.@  Id. (quotations omitted). 

Expert testimony is admissible to
aid the jury in its decision, but it may not supplant the jury=s
decision.  Perkins v. State, 902
S.W.2d 88, 93 (Tex. App.CEl Paso
1995, pet. ref=d).  AThe
question under Rule 702 is not whether the jurors know something about this
area of expertise but whether the expert can expand their understanding of this
area in any way that is relevant to the disputed issues in the trial.@  Glasscock v. Income Prop. Servs., Inc.,
888 S.W.2d 176, 180 (Tex. App.CHouston
[1st Dist.] 1994, writ dism=d by
agr.) (quotations omitted). 








Greenberg Traurig complains of
Professor Long=s testimony on the fiduciary
duties owed to IFT=s board
by Greenberg Traurig and the law firm=s
purported breach of those duties.  As
discussed above, the corporation is the only party that can bring a claim
against Greenberg Traurig for any breach of those fiduciary duties.  See Abrams v. Donati, 66 N.Y.2d 951,
498 N.Y.S.2d. 782, 783, 489 N.E.2d 751 (1985) (stating that under New York law,
shareholder has no individual claim for wrong to corporation); Wingate,
795 S.W.2d at 719 (same under Texas law). This is true even if the Investors
sustained damages as a result of a breach. 
See Abrams, 498 N.Y.S.2d. at 783, 489 N.E.2d at 751; Wingate,
795 S.W.2d at 719.  Professor Long=s
testimony with regard to duties Greenberg Traurig purportedly owed to IFT=s board
of directors was not relevant to any issue in the case and, thus, could not
have provided any assistance to the jury.

We similarly conclude that former
Justice Wallace=s
testimony was not relevant and, therefore, did not assist the jury in any way
that is germane to the matters in dispute. 
Because the Investors have no claim, and indeed could maintain no claim,
against Greenberg Traurig for negligence, and because Greenberg Traurig attorneys
were not subject to the Texas disciplinary rules, former Justice Wallace=s
opinions should not have been admitted into evidence.  

F.  Harm Analysis

To reverse a judgment based on
error in the admission or exclusion of evidence, we must conclude that the
error probably caused the rendition of an improper judgment.  Tex.
R. App. P. 44.1; Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d
394, 396 (Tex. 1989).  Error regarding
evidentiary rulings is usually not reversible unless the judgment turns on the
particular excluded or admitted evidence. 
Port Terminal R.R. Ass=n v.
Richardson, 808 S.W.2d 501, 510 (Tex. App.CHouston
[14th Dist.] 1991, writ denied).  








Most of former Justice Wallace=s
testimony concerned his interpretation of the Texas disciplinary rules with
regard to an attorney=s duty to
withdraw from representation of a client and disclose certain material facts to
third parties.  There are many problems
with this testimony.  

First, the Texas rules of
professional conduct specifically reject the notion that attorneys not licensed
in Texas are subject to these disciplinary rules.  See Tex.
Disciplinary R. Prof=l Conduct 8.05(a) & cmt. 1.  Thus, although Texas disciplinary rules were
not even applicable to the Greenberg Traurig attorneys= conduct,
the jury was allowed to consider Greenberg Traurig=s alleged
deficiencies under the Texas rules.  

Second, former Justice Wallace
opined at length that the disciplinary rules set forth the standard for civil
liability for attorney misconduct and that Greenberg Traurig was negligent for
failing to withdraw from its legal representation of IFT and for failing to
disclose J. Summers=
fraudulent activities.  Thus, the jury
was allowed to draw the conclusion that the Investors could recover for any
violation by Greenberg Traurig of the disciplinary rules, yet a violation of
the disciplinary rules does not in itself give rise to civil liability against
an attorney.[41]  Moreover, attorney malpractice was not
alleged against Greenberg Traurig, and no such claim could have been maintained
against the law firm because third parties cannot maintain a negligence claim
against attorneys with whom they did not have privity.  See McCamish, Martin, Brown & Loeffler,
991 S.W.2d at 792.  Nonetheless, the jury
was allowed to hear evidence of Greenberg Traurig=s
purported negligence, which was not an issue in this case.  Likewise, the jury was allowed to infer that
Greenberg Traurig was negligent in not withdrawing its representation of IFT
and in not disclosing certain facts, even though the Investors could not have
maintained a negligence claim against Greenberg Traurig.  








Third, former Justice Wallace
incorrectly based his opinions concerning Greenberg Traurig=s
purported duty of disclosure on the McCamish case.  Not only were these opinions based on a case
that did not address fraud or disclosures, but former Justice Wallace, himself
once a member of the Texas Supreme Court, was allowed to present his opinions
as being derived from that case, thereby lending the authority and weight of
our state=s highest civil court to his
opinions.

Fourth, former Justice Wallace=s
explanation of the role of the trial judge versus the role of the jury was not
relevant to any issue in this case.  Any
instruction on the respective roles of the judge and jury is to be given by the
trial judge.  Former Justice Wallace=s
explanation to the jury likely gave the appearance that he had more authority
than the trial judge, who was supposed to be the administrator of the court and
the one trying the case.  

Professor Long=s
testimony on Greenberg Traurig=s
purported breach of fiduciary duties for failure to disclose J. Summers= fraud
was prejudicial because the jury was allowed to conclude that the Investors
could recover damages resulting from the law firm=s failure
to make such disclosures to the boardCa
conclusion that is completely contrary to the law.  See Abrams, 498 N.Y.S.2d at 783, 489
N.E.2d at 751 (New York); Wingate, 795 S.W.2d at 717 (Texas).  Professor Long=s
testimony on questions of law was also problematic because it likely gave the
appearance that, as a law school professor, he may have had more experience and
knowledge than the trial judge. The prejudicial impact of this testimony on the
jury, in some cases, can result in the rendition of an improper judgment.  As the Texas Supreme Court has explained:

Expert witnesses can have
an extremely prejudicial impact on the jury, in part because of the way the
jury perceives a witness labeled as an expert. 
A[T]o the jury an >expert= is just an unbridled
authority figure, and as such he or she is more believable.@  A witness who has been admitted by the trial
court as an expert often appears inherently more credible to the jury than does
a lay witness.  Consequently, a jury more
readily accepts the opinion of an expert witness as true simply because of his
or her designations as an expert.

Robinson, 923 S.W.2d at 553 (citations omitted).  








The potential prejudicial effect
of an attorney testifying as an expert is of greater significance than that of
other experts.  See Specht v. Jensen,
853 F.2d 805, 808 (10th Cir. 1988) (observing significant difference exists Abetween
an attorney who states his belief of what law should govern the case and any
other expert witness.@).  Though merely being a lawyer does not
disqualify one as an expert witness,[42]
it is an important consideration and the trial court must be mindful of the
impact of allowing attorneys to testify about the law.  By permitting attorneys to state opinions as
to what the applicable law is, the trial judge voluntarily allows his role as
the legal expert in the courtroom to be usurped or diminished by the testifying
attorney.  Thus, when attorneys are
qualified as experts on certain areas of the law, the jury will be tempted to
turn to the expert, rather than the trial judge, for guidance on the law.  See Adalman v. Baker, Watts & Co.,
807 F.2d 359, 366 (4th Cir. 1986).  These
concerns are magnified when the expert witnesses are not merely practicing
attorneys in a given area of the law, but are cloaked with the authority
associated with being a learned legal scholar, a law school professor, or a
former supreme court justice.  See
United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc., 949
S.W.2d 707, 713 (Tex. App.CSan
Antonio 1997, writ denied) (stating that A[i]n
light of Dean Aldave=s
credentials and the weight likely give her testimony by the jury, we conclude
that the admission of her testimony was calculated and to cause and probably
did cause the rendition of an improper judgment.@). 

Finally, except for attorney=s fees
experts, Professor Long and former Justice Wallace were the Investors= only
expert witnesses and their testimony comprised more than half of the Investors= entire
case.  The record shows there were a
total of sixteen days of testimony. 
Professor Long, the Investors= first
witness, testified for the first eight daysCone-half
of the trial.  This testimony was
followed by the testimony of former Justice Wallace.  The Investors= other
witnesses testified solely as to factual matters.








Viewing the combined impact of
these factors, we conclude the trial court erred in allowing Professor Long and
former Justice Wallace to testify on pure questions of law, to base their
opinions on incorrect statements of the law, and to opine on issues not
relevant to the case.  We conclude the
trial court=s error probably caused the
rendition of an improper judgment.  

IX. 
Cross Appeal

                                                  A.  Bruce Payette

 

In their first issue, the
Investors, as cross-appellants, claim the trial court erred in not disregarding
a negative answer that the jury gave in the conspiracy question concerning
Bruce Payette and Greenberg Traurig.  The
jury found that Greenberg Traurig was not liable to Bruce Payette on his claims
for common-law fraud, statutory fraud, and violations of the Texas Securities
Act.  The jury, however, found other
defendantsCJ. Summers, IFT, Philip
Templeman, and Elaine TemplemanCliable to
Bruce Payette on his fraud-based claims. 
In the conspiracy question, the jury was asked whether any of the
defendants were part of a single conspiracy that damaged one or more of the
Investors.  The jury answered that
Greenberg Traurig was part of a conspiracy with J. Summers, IFT, Philip
Templeman, and Elaine Templeman; however, the conspiracy question contained a
grid with the Investors along one axis, the defendants along the other axis,
and squares in which the jury could answer Ayes@ or Ano.@  The jury answered Ano@ in the
square joining Bruce Payette with Greenberg Traurig.  Based on this negative answer from the jury
and the jury=s failure to find in Bruce
Payette=s favor
on his other claims against Greenberg Traurig, the trial court awarded Bruce
Payette no damages against Greenberg Traurig in its judgment, although it
awarded Bruce Payette damages against J. Summers, IFT, Philip Templeman, and
Elaine Templeman.  








Even though Greenberg Traurig was
not retained until after Bruce Payette had purchased his shares in IFT, the
Investors contend Greenberg Traurig is liable as a conspirator for Payette=s
damages, as a matter of law, because a conspirator becomes jointly and
severally liable for all injuries previously sustained by the claimant at the
time the new conspirator joined the then-existing conspiracy.  Based on this argument, the jury=s findings
that Greenberg Traurig was part of a conspiracy, and the jury=s
findings that Greenberg Traurig=s
co-conspirators defrauded Bruce Payette, the Investors requested that the trial
court disregard the jury=s
negative answer in the box connecting Bruce Payette and Greenberg Traurig and
enter judgment in favor of Bruce Payette and against Greenberg Traurig despite
this negative answer.  The trial court
denied this request. 

Bruce Payette=s
brother, Dennis Payette, was a member of IFT=s board
of directors and Special Assistant to the Chairman.  Dennis Payette=s role at
IFT was to locate investor groups that would be willing to bring IFT into their
community.  Bruce Payette became aware of
IFT when Dennis Payette joined the company. 
In 1995, Dennis Payette asked Bruce Payette to arrange for a group of
community leaders to attend a presentation in Nacogdoches, Texas, on IFT and
aquaculture.  Dennis Payette and J.
Summers made the presentation.  Bruce
Payette decided to buy shares in IFT after he saw the 1995 presentation.  Bruce Payette was issued 1,500 shares in IFT
on September 27, 1995, 400 shares on February 7, 1996, and 1,000 shares on
February 7, 1996.  IFT did not retain
Greenberg Traurig until November 1996, several months after Bruce Payette had
made his last investment in IFT.








It is well-settled law that upon
joining a conspiracy, a defendant becomes a party to every act previously or
subsequently committed by any of the other conspirators in pursuit of the
conspiracy. State v. Standard Oil Company, 130 Tex. 313, 107 S.W.2d 550,
560 (1937); Bourland v. State, 528 S.W.2d 350, 354 (Tex. Civ. App.CAustin
1975, writ ref=d n.r.e.).  Therefore, if Greenberg Traurig were part of
the conspiracy, its late entry into it would not relieve Greenberg Traurig of
liability, if any, for Bruce Payette=s damages
caused by Greenberg Traurig=s
co-conspirators.  See Standard Oil Co.,
107 S.W.2d at 560 (stating that a coconspirator, Ahaving
once entered the conspiracy, however late, becomes in law a party to every act
previously or subsequently done by any of the others in pursuance of it@); Bourland,
528 S.W.2d at 354 (same).[43]  

Based on this law, the jury=s
findings that others alleged to be co-conspirators defrauded Bruce Payette, and
the jury=s
findings that Greenberg Traurig was part of a conspiracy with Summers, IFT,
Philip Templeman, and Elaine Philip Templeman, we conclude the trial court
erred in not disregarding the jury=s
negative answer.  We sustain the
Investors= first cross-issue and reverse
the judgment on Bruce Payette=s
conspiracy claim.  However, in light of
our determination that the trial court=s error
in admitting the expert testimony of Professor Long and former Justice Wallace
was harmful and compels a new trial of the conspiracy claims, we must also
remand for a new trial Bruce Payette=s claim
regarding Greenberg Traurig=s alleged
conspiracy to commit common-law fraud.  

B.  Common-Law Fraud Damages








In their
second issue, the Investors, as cross-appellants, argue the trial court
erroneously denied damages found by the jury for common-law fraud by limiting
those actual damages against Greenberg Traurig to only the amount of money they
paid for the IFT stock.[44]  The trial court, however, reduced the dollar
amount to the same amount the jury found on all other theories of recovery,
i.e., the amount of money the Investors paid for their stock.[45]  Because of our disposition of the Investors= claims
for fraud, it is not necessary for us to consider this cross-issue.  

X.  Conclusion

In
summary, we hold that the trial court erred in applying Texas law instead of
New York law to the Investors=
fraud-based claims.  Because New York law
does not provide for a private claim for statutory securities fraud, we reverse
that portion of the judgment and render judgment that the Investors take
nothing by their statutory securities fraud claims.  Similarly, because it was error to apply
Texas law to the fraud-based claims, the Investors cannot recover under Section
27.01 of the Texas Business and Commerce Code; therefore, we reverse that
portion of the judgment and render judgment that the Investors take nothing on
their statutory fraud claims.  We further
hold that the Investors cannot recover on their claims for common-law fraud for
nondisclosure based on the violation of an ethical duty or in the absence of a
fiduciary relationship; accordingly, we reverse that portion of the judgment
and render judgment that the Investors take nothing on their claims for
common-law fraud.  








We also
hold that the trial court erred in admitting the expert testimony of Professor
Long and former Texas Supreme Court Justice Wallace and that this error was
harmful.  In light of this holding and
our finding that the evidence is legally sufficient to support the jury=s finding
of conspiracy to commit common-law fraud, we reverse that portion of the
judgment and remand to the trial court for a new trial as to the claims of
Moody, Briscoe, and Williams for conspiracy to commit common-law fraud.  

Finally,
with respect to the Investors=
cross-appeal, we hold that Greenberg Traurig can be liable as a co-conspirator
for Bruce Payette=s
damages, if any, even if the law firm did not join the conspiracy until after
Bruce Payette made his investment. 
Therefore, we reverse that portion of the judgment denying Bruce Payette=s
recovery from Greenberg Traurig on his claim for conspiracy to commit
common-law fraud and remand that claim to the trial court for a new trial.  

Accordingly,
we reverse and render, in part, and reverse and remand, in part, for a new
trial.  

                        

        /s/            Kem
Thompson Frost

                        Justice

 

Judgment
rendered and Opinion filed September 30, 2004.

Panel
consists of Justices Yates, Fowler, and Frost.

 

 











[1]  See
Securities & Exchange Comm=n
v. Manus, No. C-81-1222-RPA, 1981 WL
1721 (S.D.N.Y. Dec. 6, 1981) (setting forth district court=s order permanently enjoining J. Summers from selling
unregistered securities).  





[2]  IFT could sell
registered securities only if it filed a registration statement.  See 15 U.S.C. ' 77e(a) (2004). 
However, because securities issued in a private placement are not
registered securities, J. Summers could not, due to the permanent injunction,
sell stock issued in a private placement.





[3]  In July 1998,
Moody purchased additional IFT shares for $66,000.





[4]  A prospectus
J. Summers used as a marketing tool mentioned Ellsworth Wiles, and IFT=s 1997 annual report again listed Ellsworth,Wiles as
IFT=s Asecurities attorneys.@ 





[5]  Tex. Civ. Prac. & Rem. Code Ann. ' 41.008(c) (Vernon Supp. 2004).





[6]  Tex. Pen. Code Ann. ' 32.46(a)(1) (Vernon Supp. 2004).





[7]  Tex. Pen. Code Ann. ' 32.43 (Vernon 2003).





[8]  Moody was also
awarded actual damages of $20,012,610 and prejudgment interest in the amount of
$5,603,530.80 and attorney=s fees of $1,611,500 for preparation and trial, plus
$325,260 for expenses, $190,000 for appeal to the court of appeals and $85,000
for appeal to the Texas Supreme Court, jointly and severally, against IFT, J.
Summers, and Philip and Elaine Templeman. 
Moody was further awarded exemplary damages of $4,830,630 against J.
Summers, of $10,351,350 against IFT, of $690,090 against Philip Templeman, and
of $690,090 against Elaine Templeman.





[9]  Briscoe was
also awarded actual damages in the amount of $870,000, prejudgment interest in
the amount of $243,600, and attorney=s fees
in the amount of $1,611,500 for preparation and trial, plus $325,260 for
expenses, $190,000 for appeal to the court of appeals and $85,000 for appeal to
the Texas Supreme Court, jointly and severally, against J. Summers, IFT, and
Philip and Elaine Templeman. Briscoe was further awarded exemplary damages
against J. Summers in the amount of $210,000, IFT in the amount of $450,000,
Philip Templeman in the amount of $30,000, and Elaine Templeman in the amount
of $30,000.  





[10]  Williams was
also awarded actual damages in the amount of $822,500, prejudgment interest in
the amount of $230,300, attorney=s fees
for preparation and trial in the amount of $1,611,500, plus $325,260 for
expenses, $190,000 for appeal to the court of appeals and $85,000 for appeal to
the Texas Supreme Court, jointly and severally, against J. Summers, IFT, and
Phillip and Elaine Templeman.  Williams
was further awarded exemplary damages against J. Summers in the amount of
$192,500, IFT in the amount of $412,500, Philip Templeman in the amount of $27,500,
and Elaine Templeman in the amount of $27,500.





[11]  Bruce Payette
was awarded actual damages in the amount of $435,000, prejudgment in the amount
of $121,800, and attorney=s fees in the amount of $1,611,500 for preparation and
trial, plus $325,260 for expenses, $190,000 for appeal to the court of appeals
and $85,000 for appeal to the Texas Supreme Court, jointly and severally,
against J. Summers, IFT, and Philip and Elaine Templeman.  Payette was also awarded exemplary damages
against J. Summers in the amount of $101,500, IFT in the amount of $217,500,
Philip Templeman in the amount of $14,500, and Elaine Templeman in the amount
of  $14,500.  





[12]  The Investors
claim that many misrepresentations occurred during Moody=s tour of IFT=s
Pennsylvania facility conducted by J. Summers. 
Moody=s action in reliance on these representations occurred
for the most part in Pennsylvania.  He
made his decision to invest while in Pennsylvania, though he did not send his
check to purchase the IFT stock until he returned to Texas. Under these
circumstances, the Restatement suggests that the law of Pennsylvania would
apply Aunless, with respect to the particular issue, some
other state has a more significant relationship under the principles stated in
' 6 to the occurrence and the parties,@ in which event the local law of the other state
should be applied.  See Restatement (Second) Conflicts of Law ' 148.  Some acts
in reliance occurred in Pennsylvania (Moody=s
decision to invest during his visit to IFT=s
Pennsylvania facility), while others occurred in Texas (sending checks and
wiring money from Texas to purchase IFT stock). 
Thus, no state emerges as the sole place of reliance.





[13]  The Investors= failed investment in IFT is the subject of this
suit.  IFT=s
headquarters and main facility are located in Pennsylvania.





[14]  Moody=s stock purchase agreement provides for notice to
Moody in Galveston, Texas, but specifies no place of performance, and contains
no provision stating that Moody=s performance is to be rendered in Texas.  There is no evidence indicating where Moody
sent his money to purchase his shares, but Briscoe received instructions to
wire funds to IFT=s bank in Pennsylvania.  





[15]  To support
their claims that Greenberg Traurig was participating in the fraud, the
Investors rely on statements in an August 12, 1998 opinion letter Greenberg
Traurig issued in connection with IFT=s
efforts to obtain a secured term loan and a secured line of credit from the
Bank of Pennsylvania.  These actions by
Greenberg Traurig all occurred in New York.





[16]  The Investors
allege that Greenberg Traurig failed to disclose material information relating
to the cost of an IFT rescission offer to its shareholders.  Communications relating to these events took
place in New York.





[17]  The Investors
allege that in the fall of 1996, J. Summers retained Greenberg Traurig to
assist IFT in preparing for its annual shareholders meeting scheduled to take
place in New York.  Among the topics
covered at that meeting was Arthur Andersen=s  resignation as IFT=s independent auditor. 
The Investors allege that by failing to disclose the true reason for the
auditor=s resignationCthe
Mississippi judgment against J. SummersCand to
make other necessary disclosures at this meeting, Greenberg Traurig assisted
IFT and J. Summers in defrauding investors. 
These eventsCpreparation and presentation for the annual
shareholders meetingCoccurred in New York.





[18]  The Investors
allege that in December 1997, IFT urged Greenberg Traurig to introduce IFT to
investment bankers so that IFT could pursue its goal of an initial public
offering and that despite knowledge of J. Summers=
activities, Greenberg Traurig did so, thereby furthering a conspiracy to
defraud.  Greenberg Traurig introduced
IFT to Josephthal & Co., a New York securities corporation.  Greenberg Traurig=s activities concerning Josephthal took place in New
York.





[19]  See Tex. Disciplinary R. Prof=l Conduct 4.01(b), reprinted in Tex. Gov=t Code Ann. tit. 2, subtit. G app. A (Vernon 1998) (Tex. State Bar R. art. X, ' 9).

 





[20]  The law in
Texas is the same.  The failure to
disclose information does not constitute fraud in the absence of a duty to
disclose.  Bradford v. Vento, 48
S.W.3d 749, 755 (Tex. 2001).  Generally,
no duty to disclose arises in the absence of a confidential relationship.  Insurance Co. of N. Am. v. Morris, 981
S.W.2d 667, 674 (Tex. 1998).  Fiduciary
duties arise as a matter of law in certain formal relationships, including
attorney-client, partnership, and trustee relationships.  Id. 
In the absence of a formal fiduciary relationship, a confidential
relationship may arise when the parties have dealt with each other in such a
manner, for a long period of time, that one party is justified in expecting the
other to act on its behalf.  Id.  To impose an informal duty in a business
transaction, the special relationship must exist prior to, and apart from, the
agreement made the basis of the suit.  Associated
Indem. Corp. v. Cat Contracting, Inc., 964 S.W.2d 276, 288 (Tex.
1998).  





[21]  The Investors
argued Greenberg Traurig=s failure to advise third parties that J. Summers and
IFT were involved in fraud violates reasonable standards of minimum attorney
conduct as found in Disciplinary Rule 4.01(b). 
The rule is the same in Texas as in New York.  In Texas, the disciplinary rules do not
define standards of civil liability of lawyers for professional conduct.  Tex.
Disciplinary R. Prof=l Conduct
preamble & 15, reprinted in Tex. Gov=t Code Ann. tit. 2, subtit. G app. A (Vernon 1998) (Tex. State
Bar. R. art. X, ' 9); Joe v. Two Thirty Nine Joint Venture, 47
Tex. Sup. Ct. J. 1058, 1063 n.2, 2004 WL 1966000, at *5 n.2. (Tex. Sept. 3,
2004).





[22]  As noted in
section III., supra, Greenberg Traurig asserts there is no difference
between Texas and New York law with respect to conspiracy.  Therefore, we apply Texas law to this
claim.  See Weatherly, 905 S.W.2d
at 650 (stating burden is on party asserting application of other state=s law to establish conflict with Texas law).  





[23]  Similarly, to
establish civil conspiracy under New York law, the plaintiff must demonstrate
the primary tort, plus the following four elements: (1) an agreement between
two or more parties, (2) an overt act in furtherance of the agreement, (3) the
parties= intentional participation in the furtherance of a
plan or purpose, and (4) resulting damage or injury.  Frazier v. Turning Stone Casino, 254
F. Supp. 2d 295, 313 (N.D. N.Y. 2003); World Wrestling Fed=n Entm=t,
Inc. v. Bozell, 142 F. Supp. 2d 514,
532 (S.D. N.Y. 2001).  Although it is not
necessary for the plaintiff to allege and prove that each defendant committed
each element of fraud, the plaintiff, must establish facts supporting an
inference that A>the defendants knowingly agreed to cooperate in a
fraudulent scheme, or shared a perfidious purpose . . . [and,] [when] scienter
is lacking, the mere fact that a defendant=s
otherwise lawful activities may have assisted another in pursuit of guileful
objectives is not a sufficient basis for a finding that he or she conspired to
defraud.=@  Snyder v.
Puente Brooklyn Realty Corp., 297 A.D.2d 432, 435, 746 N.Y.S.2d 517, 521B22 (N.Y. App. Div. 2002), appeal denied, 99
N.Y.2d 506, 755 N.Y.S.2d 712, 785 N.E.2d 734 (N.Y. 2003) (quoting Le Febvre
v. New York Life Ins. & Annuity Corp., 214 A.D.2d 911, 912B13, 625 N.Y.S.2d 695, 696 (N.Y. App. Div. 1995)). 





[24]  Greenberg
Traurig asserts additional charge error in that the trial court=s charge allowed the jury to find Greenberg Traurig
liable for conspiracy on invalid underlying theories of liability, i.e.,
non-intentional tortsCseller and control person liability under the Texas
Securities Act, as well as on valid theories of liability, i.e., intentional
torts such as fraud, thereby rendering it impossible to determine whether the
jury based its finding of civil conspiracy on a valid or an invalid theory of
liability.  See Crown Life Ins. Co. v.
Casteel, 22 S.W.3d 378, 388 (Tex. 2000) (holding that when trial court
submits single broad‑form liability question incorporating multiple
theories of liability, error is harmful and new trial is required when
reviewing court cannot determine whether jury based its verdict on improperly
submitted invalid theory).  We have
concluded New York law applies to the Investors=
fraud-based claims and the Investors cannot maintain a claim for statutory securities
fraud; therefore, it is not necessary for us to address whether the jury charge
based conspiracy liability on both a valid theory of liability, such as fraud,
or on an allegedly invalid theory of liability, such as seller and control
person liability, under the Texas Securities Act.  





[25]  Greenberg
Traurig also complains the evidence is factually insufficient to support the
jury=s finding of civil conspiracy.  Although our disposition of Greenberg Traurig=s issue on the expert testimony will require a remand
on the Investors= claim that Greenberg Traurig conspired to defraud
them, we must consider Greenberg Traurig=s issues
requesting a rendition before ordering a remand.  See Tex.
R. App. P. 43.3; Lone Star Gas Co. v. Railroad Comm=n of Tex.,
767 S.W.2d 709, 710 (Tex. 1989) (per curiam). 






[26]  Emphasis
added.  





[27]  See 17
C.F.R. '' 230.505B.506
(2004).





[28]  Chalphin=s July 7, 1997 memo stated: ABased on the information at hand, we estimate that the
Company should set aside (or have available to it) an aggregate amount of
approximately $16,834,000 (representing $14,569,528 in estimated aggregate
original invested funds, together with interest) to fund the rescission
offering.@





[29]  Greenberg
Traurig=s opinion letter to the Bank of Pennsylvania stated,
in relevant part:

 

To our knowledge, without investigation, there is not an existing,
threatened or pending action against or affecting the Borrower or Pledgor which
would have a material adverse effect upon it/them or upon the Mortgaged
Premises (Pennsylvania Property) and (Maine Property) or its contemplated uses.





[30]  Greenberg Traurig knew about the
Mississippi lawsuit because it was J. Summers= failure to disclose that lawsuit
and judgment that ultimately resulted in Arthur Andersen=s terminating its agreement to
audit IFT=s financial statements.  In May 1998, J. Summers and IFT were sued in
Maine for issuing stock in violation of Maine securities laws.  Kirshenberg represented IFT in the settlement
of that lawsuit.  





[31]  The draft
letter to the disgruntled IFT shareholders stated:  

 

We are sorry that you are disappointed with IFT.  You are the only stockholders who have voiced
dissatisfaction.  We cannot answer for
each and every projection that was shown to you.  Things change and modify.  In our case it has all been for the better,
albeit not exactly as projected.

 

The 1996 audit was not as fast as we anticipated.  Unfortunately, we had IPO considerations to
interface with it, including selection of auditors, etc.  We are willing to rescind your original stock
to you at the price you paid (we cannot pay interest).  We are prepared to do so on or before 15
November 1996.





[32]  Rule 166
provides, with regard to pre-trial conferences, in relevant part:

 

In an appropriate action, to assist in the disposition
of the case without undue expense or burden to the parties, the court may in
its discretion direct the attorneys for the parties and the parties or their
duly authorized agents to appear before it for a conference to consider:

 

(m) Written trial objections to the opposite party=s exhibits, stating the basis for each objection;

                                                                    *        *       
*

(p) Such other matters as may aid in the disposition
of the action . . . [S]uch order when issued shall control the subsequent
course of action, unless modified at the trial to prevent manifest injustice.

 

Tex. R. Civ. P.
166.





[33]  The trial
court specifically stated, AOn the Motion to Strike, 15 minutes for each side?@  





[34]  The trial
court expressly stated, AI=m going to deny your Motion to Strike Professor Long.@  





[35]  The following
exchange took place:

 

MR. BRUNS [counsel for
Greenberg Traurig]:  Ready, your
Honor.  I think Wallace is next up.  May I proceed with my Motion to Strike
Justice Wallace?  

 

THE COURT: 
Yes.  And I have the Motion to
Strike and the responses.  So, you don=t have to be too detailed.  





[36]  Emphasis
added.  





[37]  The trial
court stated, AI=m going to deny your motion, Mr. Bruns. . . . I=m going to allow Justice Wallace to go into the
ethical issues also.@





[38]  Trial counsel
questioned Professor Long about Holly v. International Mari-Culture Techs.,
Ltd., No. 131,114 (Chancery Ct., 1st Dist., Hinds County, Miss. Mar. 30,
1989) (quoting Ellzey v. Fyr-Pruf, Inc., 376 So.2d 1328, 1332 (Miss.
1979) (quoting Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928))).  





[39]  991 S.W.2d 787
(Tex. 1999).  





[40]  See Tex. Disciplinary R. Prof=l Conduct preamble & 15;
Joe, C3d at C, 2004 WL 1966000, at *5, n.2. Similarly, a violation
of New York=s code of professional responsibility does not provide
for a private claim against an attorney. 
Shapiro, 699 N.E.2d at 408. 






[41]  See Tex. Disciplinary R. Prof=l Conduct preamble & 15;
Joe, 2004 WL 1966000, at *5 n.2. 





[42]  Askanse v.
Fatjo, 130 F.3d 657, 672 (5th Cir. 1997). 






[43]  Greenberg
Traurig argues the possibility of multiple conspiracies; however, the jury
charge refers to only a single conspiracy.





[44]  The jury found the following
damages for common-law fraud against the defendants: 

 

Moody......................................... $20,702,700

Briscoe............................................ $900,000

Williams........................................... $825,000

Payette ........................................... $435,000

 





[45]  The trial
court=s judgment awarded the following actual damages
against Greenberg Traurig:  

 

Moody  .............................................. $690,090

Briscoe $30,000

Williams ............................................... $27,500

Payette $0

 

However, the
trial court=s judgment awarded the following actual damages
against J. Summers, IFT, Philip Templeman, and Elaine Templeman:

 

Moody............................................. $20,012,610

Briscoe................................................. $870,000

Williams............................................... $822,500

Payette................................................. $425,000